**LAKE MICHIGAN COLLEGE FEDERATION OF TEACHERS** and **Edward Shaffer, Individually and as representative of other Individuals similarly situated and too numerous to conveniently be here set forth, Plaintiffs,**

v.

**LAKE MICHIGAN COMMUNITY COLLEGE, a public education institution established under the laws of the State of Michigan, et al., Defendants.**

**Civ. A. No. K–49–73.**

United States District Court,
W. D. Michigan, S. D.

Sept. 27, 1974.

108

Bernard J. Fieger, Craig, Fieger & Golden, Southfield, Mich., for plaintiffs.

Robert C. Claus, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., Paul A. Taglia, Spelman, Taglia, Meek & Lagoni, St. Joseph, Mich., for defendant Lake Michigan Community College.

Gerald F. Young, Asst. Atty. Gen., Lansing, Mich., for defendant State Board of Education.

## OPINION

FOX, Chief Judge.

This case arose out of an employment dispute between Lake Michigan College (hereafter referred to as the College) and certain of its employees, most of whom were teaching faculty represented by the Lake Michigan College Federation of Teachers, their certified bargaining agent (hereafter referred to as the Union). Although this case was originally begun as a class action, the pleadings were amended so that the plaintiffs are the Lake Michigan College Federation of Teachers and the named individuals, all of whom were the subjects of disciplinary action taken by the College as a result of a work stoppage which began on February 15, 1973. The defendants are the Lake Michigan Community College, a publicly created and financed two-year junior college; the individuals who were members of the College's Board of Trustees, the governing body, when the dispute arose; and the President of the College, the institution's chief executive officer. The Attorney General of the State of Michigan was admitted as an Intervenor Defendant.

The gravamen of the amended complaint[1] is that certain actions taken or proposed to be taken by the defendants principally during February, March and April of 1973 in connection with discharge proceedings violated or would violate the Fourteenth Amendment due process rights of the plaintiffs to notice and hearing by an impartial tribunal before the deprivation of their protected interests by the defendants.[2] The plaintiffs are seeking reinstatement with damages incident to the reinstatement, and further declaratory and injunctive relief with respect to the proposed form of the discharge hearings. This case falls under 42 U.S.C. Sec. 1983, and this court has jurisdiction under 28 U.S.C. Secs. 1343(3) and (4), and 28 U.S.C. Secs. 2201 and 2202.

## I.

Before discussing the legal merits of this case, the court must make a comprehensive survey of the facts, review the relevant Michigan public employment relations law, and survey the procedural history of this case to date.

## A.

Because of the truncated jurisdiction of this court and the nature of the issues upon which this court may rule, it is necessary to make an especially thorough examination of the facts in this case, and to assess in particular the course of bargaining between the College and the Union during 1972–1973.[3]

Shortly after this case was filed, the court, after a hearing during which it was informed of the essential facts, issued an Opinion and Temporary Restraining Order. Although the court has since received a much greater volume of evidence, enabling a more detailed view of the case, this evidence has convinced the court that its original assessment of the case was correct. In particular, the court is convinced, as it said in its original Opinion, that the "intransigence" of the Board on the issue of salaries was "so provocative that it must be characterized as being violent, if not barbaric." The Opinion is reproduced as Appendix A, and is incorporated herein by reference.

Lake Michigan College was originally established as the Junior College of Benton Harbor by the Benton Harbor Board of Education in 1946. At a special election in 1963, the voters approved the creation of the Community College District of Berrien County, Michigan, with a separate Board of Trustees to manage the institution. Voters also approved a tax levy for twenty years from 1964 to finance the school. At this time, the name was changed to Lake Michigan College.

While the record does not show the date on which the Lake Michigan College Federation of Teachers (abbreviated in the record as LMCFT) was certified as the bargaining representative of the faculty,[4] it does reveal that the first collective bargaining agreement went into effect during the Fall term, 1967,[5] following a six-week strike by the faculty which was settled by voluntary arbitration.

At the trial of this cause, Dr. James L. Lehman, who had assumed his position as President of the College in July 1967, just before the strike, indicated by his expression and manner that the College authorities had never fully accepted

---

1. The amended complaint is adequate to give the defendants notice of the nature of the charges against them.

2. Although the plaintiffs might have alleged that the defendants' actions infringed their First and Fourteenth Amendment rights of freedom of association, they did not raise this issue. The major issues in this case thus relate exclusively to procedural due process.

3. Jurisdiction and the precise legal issues raised by this case are fully discussed below.

4. "Faculty" and "teachers" are terms used throughout this opinion to connote members of the bargaining unit, even though the unit contains some non-teaching personnel.

5. Jt.Ex. 22.

many of the terms of the collective bargaining argeement which had been "imposed" upon the College by the arbitrators in the Fall of 1967.[6] This intense dissatisfaction with the results of the strike and with the whole principle of collective bargaining contributed to the hostility which the College demonstrated toward the Union and the teachers, and is evidence that the College had concluded that the second strike would be the last.

Following the expiration of the 1967–68 agreement, new agreements were reached and implemented in 1968–69, 1969–70, and 1970–72.[7] The number of agreements indicates that the parties have been almost constantly negotiating or preparing for negotiations since the stormy beginning in 1967. With important issues thus almost always joined, a stable union-management relationship never developed.

■ Although the 1970–1972 collective bargaining agreement was not scheduled to expire until August 1972, the Union initiated the process of bargaining toward a new contract in December 1971. On December 13, the Union formally wrote the College as follows: [8]

"In accordance with Article XVIII of the Master Agreement between the Board of Trustees of Lake Michigan College and the L.M.C. Federation of Teachers, we hereby notify you of our intention to begin negotiating a successor agreement to the present contract. Our negotiating team has been selected and it is our desire to begin negotiations prior to the stated date of February 15, 1972, in order to conclude an agreement early. We wish to point out that [it] is possible to begin before February 15 and that the contract does not prohibit it. We urge your team to prepare your position as soon as possible so we can begin."

The Union submitted a substantial number of its proposals in February 1972, and had submitted all its proposals by April 13.[9] This early action by the Union was responsibly designed to ensure that there would be ample time to complete the new agreement by the beginning of the 1972–73 academic year.[10] In fact, as appears more fully below, the unreasonable demands and intransigence

---

6. Trial Tr. at 238–240. The resentment at the infringement of management prerogatives which resulted from the 1967 arbitration perhaps accounts in part for the categorical rejection of the Union's offer to submit unsettled issues to arbitration early in February 1973.

7. The collective bargaining agreements are in evidence as follows: Jt.Ex. 21, 1968–69; Jt.Ex. 20, 1969–1970; Jt.Ex. 16, 1970–72. The last agreement was not for a full two years, but went into effect on December 28, 1970, and expired August 12, 1972.

8. In Pl.Ex. 2, Ex. 13. Pl.Ex. 2 is a series of documentary exhibits submitted during the hearings before the Michigan Employment Relations Commission Trial Examiner on the plaintiffs' unfair labor practice charge.
Pl.Ex. 2 is among a set of exhibits, Nos. 1–9, offered by the plaintiffs relating to the course and content of bargaining between the parties during 1972–1973, and relating also to proceedings before or under the auspices of M.E.R.C. The defendants have stipulated to the authenticity of these exhibits, but not their relevance. The court finds that exhibits relating to these matters are relevant to this suit. It is elementary that the resolution of procedural due process issues requires a preliminary finding and careful analysis of all the significant elements of a given situation. See, e. g., Cafeteria and Restaurant Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Correlatively, since justice, or the lack of it, inheres in specific situations, all the circumstances of a case must be known to enable the court to invoke a central value of the Due Process Clause, fundamental fairness.

9. In Pl.Ex. 2, Ex. 20.

10. On June 1, 1974, Michigan Governor William G. Milliken urged a group of school administrators, school board members, and teachers from around the state to undertake good faith bargaining as early as possible to avert school strikes in the fall. Grand Rapids Press, June 2, 1974, p. 1. The court observes that the Union in this case did undertake early good faith bargaining, but the College did not reciprocate.

of the College prevented any such agreement from being reached.

It is important to note the general economic and social conditions within which the bargaining took place. It was a period of extraordinarily high inflation, and the President had imposed a ceiling of 5.5% on wage increases. Many families of modest income found it very difficult to maintain a decent standard of living.

During the fall of 1972, teacher strikes increased as public school administrators resisted pay raises which teachers required to merely stay even with inflation. Although there had been teacher strikes in 11 Michigan public school and college systems in 1971–72, there were 17 such strikes in 1972–73. All of the 1972–73 strikes involved contract renewals.[11]

A substantial number of non-vital issues had been resolved by early August 1972. At this time the College requested the services of a mediator to be appointed by the Michigan Employment Relations Commission pursuant to the Michigan Public Employment Relations Act.[12] A mediator was appointed, and the parties met with him.

The collective bargaining agreement expired on August 12, 1972, but the teachers returned to work at the beginning of the 1972–73 school year under a "day-to-day understanding" with the College. By the terms of the understanding, the teachers would work under the provisions of the expired 1970–72 collective bargaining agreement, except that the new contract terms which had been agreed upon before September 8, 1972, would be implemented.[13] One of the sections of the old contract which was continued was a provision whereby the Union and the faculty agreed not to strike and the College agreed not to lock out during the term of the agreement.[14]

On August 17, 1972, the Union requested fact-finding pursuant to P.E.R.A. A factfinder, Mr. J. Warren Eardley, of Grand Rapids, Michigan, was appointed. The first meeting with the factfinder was held on October 17, 1972, but was adjourned to November 13, 1972, to give the parties an opportunity to bargain further. By the time the factfinder's report was issued on January 11, 1973,[15] the parties had reached agreement on all but three issues, each of which was examined by the factfinder.

The three issues on which the parties were unable to agree were the salary schedule, the duration of the contract,

11. State of Michigan, Department of Labor, "Annual Report, Fiscal Year 1972–73," at 166, 167, Tables 8, 10 (1974).

12. M.C.L.A. Sec. 423.201 et seq., M.S.A. Sec. 17.455(1) et seq. For convenience, the court will refer to the statutes in effect at the time this case arose as the Public Employment Relations Act, or P.E.R.A. M.E.R.C. is the administrative agency which has primary authority over labor relations in Michigan. P.E.R.A., M.E.R.C., and Michigan's employment relations policies are discussed more fully below.

13. Jt.Ex. 18. The parties have stipulated that the agreement was a "day-to-day" understanding, Jt.Ex. 23, No. 2, but they have not stipulated as to the meaning of "day-to-day." The defendants have argued that since the understanding was without a stated term, it was therefore terminable at will, by either party. See, e. g., Trial Tr. at 46. However, the court finds that the understanding was intended to extend at least to the end of the

1972–73 school year. It was day-to-day only in the sense that it could be replaced by a full collective bargaining agreement.

14. Jt.Ex. 16, Art. XVI. The no-strike, no-lockout provision reads as follows:

"STRIKES AND LOCKOUTS

*Section 1.* The Federation agrees it will not instigate, aid, or condone work stoppages, strikes, shutdowns or other interruptions of work during the term of this Agreement.

It is further agreed that no faculty member shall engage in a strike or work stoppage in any form during the term of this Agreement.

The College agrees that there shall be no lockouts during the term of this Agreement."

15. The "Factfinder's Opinion and Recommendations (hereafter referred to as "Factfinder's Opinion"), is found in Pl.Ex. 2, as Ex. 11 submitted in the M.E.R.C. unfair labor practice hearings.

and the number of weeks' work scheduled for the assistant librarians. The latter issue was of secondary importance. The issues of the salary schedule and the duration of the contract were closely related, and were the subject of major difficulty.

Since the first collective bargaining agreement of 1967, each of the Lake Michigan College faculty members had been paid according to where he (or she) fell upon a negotiated salary schedule referred to as the "grid." The grid set forth a schedule of salary increments along horizontal and vertical axes. An increment on the horizontal axis was attained through the acquisition of an additional degree or of a stated number of additional educational credits by the individual teacher. The vertical axis was graded by the number of years' service the teacher had given to the institution, up to a stated maximum. Progression on this vertical axis was automatic, so the salary increase was in the nature of a longevity increment. The maximum dollar amount possible on the grid was reached at eleven years' service for a person with an M.A. Degree, and at fourteen years' service for a person with an M.A. Degree plus thirty additional approved educational credit hours.[16] The record does not show the number of faculty members who had reached the maximum on the salary schedule, but there was a suggestion that there were "many" faculty members at the top of the grid during the 1972–73 academic year.[17] In each of the parties' collective bargaining agreements, the whole salary schedule was increased, so that persons at the top of the scale received increases, and persons who fell within the grid received that which they would have received under the old agreement for longevity and additional education, plus the amount of the negotiated increase.

At the outset, the Union sought a one-year contract, and the College a five-year contract. Both parties soon became willing to negotiate a three-year contract, and this term became the focus of bargaining on the salary matters until early February 1973.

From the inception of bargaining in the late winter of 1972, the Union, conscious of the relentless pressure of inflation on its members, demanded a general increase in the salary scale in accordance with past practices. However, the Union's demands were limited to a 5.5% increase, the amount allowed at the time under the wage and price controls.[18]

For about a year, from the winter of 1972 until early February 1973, the College "stonewalled" on the issue of salaries. It insisted that the 1971–72 salaries were high enough. The issue was never the availability of money, since the College was financially able at all times to pay all that the teachers requested. Rather, the College stated that the issue was one of "priorities." Specifically, the College insisted that during 1972–73 salaries be frozen at the 1971–72 levels, with no movement whatsoever on the vertical longevity axis or on the horizontal educational improvement axis of the grid. The College furthermore insisted that in subsequent years of the contract salary increments would be granted only on the 1971–72 scale.

A salary freeze in a time of inflation means a reduction in real wages. Despite consistent past practices and the institution's ability to pay, this is what the College demanded of the teachers. Moreover, the College demanded rigid adherence to the 1971–72 scale in the fu-

16. The basic salary scheme, but not the amounts, remained constant in all the agreements. See Jt.Exs. 22, 21, 20, 16. The scheme is discussed more fully in the "Factfinder's Opinion" at 1–7. A salary grid of the type used at Lake Michigan College is usual in Michigan community colleges. Buys, "Collective Bargaining in Michigan Community Colleges," 21 Journal of the College and University Personnel Association 33, 42 (1970). .

17. Tr., Proceedings on Motion to Stay Court's Order, April 30, 1973 at 15. (Hereafter referred to as "Stay Proceedings.")

18. Factfinder's Opinion, at 4–5.

ture, whatever the inflationary state of the economy. Under the circumstances, these demands were arbitrary, capricious, and unreasonable.

The College's tactics of "stonewalling" on the most vital issue of wages is the modern counterpart of the union-busting tactics used by employers in the early years after the passage of the National Labor Relations Act in 1935. The N.L.R.A. gave employees in most private industry the right to organize and bargain collectively so as to partially equalize the bargaining power of labor and management, to bring peace to the nation's industries, and to improve wages, hours, and working conditions over the long run. One tactic employers used to break the unions formed under the authority of the Act was to simply refuse to bargain on one or more vital issues.

Similarly, the Michigan Public Employment relations Act gave public employees the right to organize and bargain' collectively. P.E.R.A. included a no-strike provision, but a *quid pro quo* for the prohibition on strikes was an extra duty on the employer to be fair in bargaining. The College's stonewalling tactic was, in light of the parties' bargaining history and the inflationary economic conditions, a deliberate attempt by the employer to break the Union, and plainly a disruption of the balance between employer and employee which P.E.R.A. intended to establish.

After the hearings on the salary and contract duration issues, the M.E.R.C.-appointed factfinder, on January 11, 1973, found that the College's position on salaries was "impractical and unrealistic." Comparing Lake Michigan College teachers' salaries with those of oth-er junior colleges around the state and with public schools in the local area, he found that Lake Michigan College salaries were lower than some, higher than others, and competitive for the area. The factfinder recommended the retention of the grid system and an increase at all levels, in accordance with past practice, in the amount then established as a maximum by law, 5.5%. The factfinder also recommended the negotiation of a three-year contract.[19] While the Union urged the acceptance of the factfinder's recommendations, the College rejected them.

After the issuance of the Factfinder's Opinion, the parties had bargaining sessions on February 2, 7, and 13. Although events moved rapidly during this period, and the bargaining was complex, the major developments can be summarized. The Union negotiating team reluctantly proposed to substantially write off 1972–73, and to move almost immediately to negotiations concerning 1973–74 and subsequent years. The Union offered and the College accepted a one-year contract for 1972–73, with salaries at the 1971–72 level, except that those teachers who had earned sufficient additional graduate credits would receive increments on the horizontal scale under the 1971–72 contract.[20] However, the faculty voted to reject this proposal.

With the Union and faculty thus split, the College moved to the attack. It significantly modified its earlier position by now insisting upon a complete abolition of the vertical longevity incremental scale, so that teachers would no longer be entitled to automatic increases up to the maximum on the scale simply for serving additional years.[21] The College

---

19. Id. at 9 ff.

20. In Pl.Ex. 2, Ex. 18.

21. The defendants have suggested that the abolition of the vertical longevity incremental scale was not a new principle introduced in February 1973, but a principle implicit in the proposal for frozen salaries, which was laid on the table in the spring of 1972. However, a proposal to freeze salaries for a single year is not the same as a proposal to abolish the whole principle of the grid for the future. Before February 1973, the proposal for frozen salaries was offered in conjunction with proposals for a five-year or three-year contract, with the 1971–72 salary grid being in effect for the years after the first. The earlier proposals thus carried no direct threat to the principle of the salary

was willing to grant increases on the horizontal education scale, and was also willing to grant for the immediate future increases "equivalent" to those which would be called for if the full grid were in effect. However, in the face of the uncertain and inflationary economic conditions, the principle of the grid was to be done away with forever, and the teachers were modestly asked to join in the execution.

By making this offer, the College deliberately drove the faculty to the wall and the Union to the breaking point. The College escalated a battle over salary levels into a war over the grid principle, and then offered the Union a Phyrric victory (equivalency increases) in the battle in return for ultimate and total surrender in the war. If the teachers rejected this latest offer, and the Union did nothing but show up for negotiating meetings, there would be no salary increase whatsoever and no final collective bargaining agreement for the indefinite future. The Union would be effectively broken. However, in light of all the circumstances—the inflationary pressures felt by the teachers; the adverse faculty reaction to the proposed foregoing of the longevity increment; the obvious exasperation of the teachers with the College's assault on their security; and the number of teachers' strikes around the state—the only humanly possible reaction of the teachers was to strike. And once the strike occurred, the College would have a public relations and legal advantage, and could finally break the Union.

The court concludes that under all the circumstances known to the College at the time, the College's proposal to abolish the salary grid must have been and in fact was made with the ultimate goal of breaking the Union in any event and with the immediate goal of provoking a strike.

The court also concludes that the attack upon the Union was the first, substantial, foreseeable, and in fact foreseen, cause of the ensuing strike.

On February 14, 1973, the Union filed unfair labor practice charges with M.E.R.C., alleging that the College had failed to bargain in good faith. (The original charge was made more explicit by a Bill of Particulars filed on March 8.) After hearings on these charges on March 19, the M.E.R.C. Trial Examiner concluded that the College had committed no unfair labor practices.[22] On appeal, M.E.R.C. concurred and dismissed the charges against the College.[23]

Meanwhile, on February 15, nearly all of the faculty of Lake Michigan College began a work stoppage, allegedly solely to protest the College's unfair labor practices. Although some College classes remained in session, most of those taught by full-time instructors did not meet. The College made several appeals to the striking faculty to return to work, but most remained on strike.

The College might have gone to court to seek an injunction to end the strike, School District for the City of Holland v. Holland Education Association, 380 Mich. 314, 157 N.W.2d 206 (1968); see also, Board of Education for School District of City of Detroit v. Detroit Federation of Teachers, 223 N.W.2d 23 (Mich.Ct.App., 1974), at 26, but it did not do so. The College presented much evidence in this court as to the harm the strike did to students and to the operations of the institution. If the College had been truly concerned about protecting the students, it would have certainly at least attempted to get an injunction.

If the College had sought an injunction, it would have had to convince the court that it had "clean hands," that it was not guilty of unfair labor practices or other conduct which would make it inequitable for the court to enjoin the

grid. Nor, when the Union offered a one-year contract on February 7, did it contemplate an abolition of the principle of the grid as a basis for future bargaining.

22. Def.Ex. 4.

23. Def.Ex. 9.

strike. School District for the City of Holland, supra, 157 N.W.2d at 211. Perhaps one reason the College did not seek an injunction was that it knew that it had deliberately engaged in conduct of which no court could approve.

Certainly, an additional reason that the College did not seek an injunction was that the Board did not want one. If an injunction issued and the teachers returned to work, then the College's plan to quickly and finally break the Union would have been compromised. Conversely, the fact that the College did not even seek an injunction when it might have is some indirect evidence of a plan to keep the striking teachers out.

Instead, the College embarked on a program to finally discharge the striking teachers so as to finally break the Union. After the teachers refused to return to work, the College began offering permanent contracts to replacements. The assumption was that the striking teachers were gone from the College forever.

On February 26, 1973, the Board of Trustees passed the following Resolution: [24]

"RESOLUTION

WHEREAS, the Board of Trustees of Lake Michigan College has observed and been informed that several faculty members are engaging in a strike for the purpose of inducing, influencing, and coercing a change in their compensation and other conditions, rights, privileges, and obligations of employment, and

WHEREAS, such activities are illegal and prohibited by the State of Michigan's Public Employment Relations Act, and in violation of the faculty's obligation to provide full, faithful, and proper performance of their duties of employment,

NOW, THEREFORE, BE IT RESOLVED that the Board of Trustees of Lake Michigan College terminates such faculty members' status and employment effective Monday, March 5, 1973, unless any such faculty member shall report and resume the full, faithful, and proper performance of their duties of employment on or before such date; and

BE IT FURTHER RESOLVED that the Board of Trustees hereby authorizes the President of the College to promptly notify such faculty of this resolution, and to perform such other acts as may be necessary to carry it out.

EXECUTED this 26th day of February, 1973."

The next day, the College, by its President, wrote to each striking faculty member. The letter informed the teacher of the Board's actions, stated that according to the College's observation and information the faculty member was illegally on strike, and continued: [25]

"If you do not return to the full, faithful and proper performance of your duties of employment on or be-

---

24. Jt.Ex. 3. During the trial, the defendants objected to questions to members of the College Board of Trustees concerning each trustee's interpretation of the February 26 Resolution. See, e. g., Trial Tr. at 180. The objections were put variously in terms of the best evidence rule and the parol evidence rule, and summed up in the sentence, "The document speaks for itself." Id. These objections were not well taken. The parol evidence rule is a rule of substantive law which simply does not apply to restrict evidence concerning the interpretation of Trustees' Resolutions. See 9 Wigmore, A Treatise on the Anglo-American System of Evidence in Trials at Common Law, Sec. 2400 ff. (3d ed. 1940). The "best evidence" objection covers a variety of sins. However, there is no question here as to the content or the authenticity of the Resolution. It can hardly be objected that a Trustee's testimony as to his interpretation of a Resolution is irrelevant, without probative value. If the Resolution does speak for itself, it does not speak alone. The court should take and consider probative, trustworthy evidence concerning its proper interpretation. See 3 Id. Secs. 1171–1175. (Chadbourn ed. 1972.)

25. Jt.Ex. 4.

fore March 5, 1973, you will be terminated. Your position on the faculty of this institution will be considered vacant and someone else will be sought and employed to perform your duties. If your absence is due to reasons other than those stated herein, please promptly contact me, or in my absence, Dr. Walter Browe."

On March 5, the College terminated the Union-College "understanding" of September 11, 1972. The letter informed the Union that the action was "occasioned by your organization's material breach of that agreement's no strike provisions in Article XVI."[26]

On March 6, the College, by its President, again wrote to each striking teacher. The letter informed that faculty member that according to the College's "observation and information," he (or she) was illegally on strike.[27] The letter continued: [28]

"Your status as a faculty member, therefore, is terminated as of this date.

Within the next ten days you may request in writing a hearing to determine whether your conduct in fact has violated the Act. Such notice should

be directed to me at the College, and, if received within the required time, a proceeding thereafter will be commenced, and a decision made concerning your violation of the Act and the proper discipline, including termination."

By letter to the College dated March 5, fifty-two of the striking faculty had demanded hearings under Section 6 of P.E.R.A. to determine whether they had violated the Act. The teachers waived the time limitations in the Act "because of the number of hearings being requested." [29]

Although the P.E.R.A. hearings were scheduled for early April, this suit intervened, and the hearings have not yet been held.[30]

The parties have argued at some length, and presented much testimony, concerning the proper characterization of the Resolutions passed and the letters exchanged between the parties between the dates of February 26 and March 6. The defendants argue that although the College's intent was to permanently terminate the striking faculty as of that date, and to recruit a new faculty as soon as possible, still, in light of P.E.R.

---

26. Jt.Ex. 19.

27. Jt.Ex. 6.

28. Id.

29. Jt.Ex. 31. The form of the requested P.E.R.A. hearings was determined by the Board of Trustees by Resolution dated March 26, 1973 (Jt.Ex. 13) :
"RESOLUTION
WHEREAS the Board of Trustees of Lake Michigan College terminated certain faculty members effective Tuesday, March 6, 1973, for absenting themselves from their positions and abstaining from the full, faithful, and proper performance of their duties for the purpose of inducing, influencing, and coercing a change in their condition of employment, and
WHEREAS, certain such faculty members have requested a determination as to whether they have violated the provisions of the Public Employment Relations Act,
NOW, THEREFORE, BE IT RESOLVED that the Board of Trustees of Lake Michigan College hereby appoints Robert P. Small, Donald L. Eppelheimer,

and Earl H. Place as the officers and body to commence and hold proceedings for the determination of whether such faculty members have violated the provisions of that Act; and
BE IT FURTHER RESOLVED that the Board of Trustees hereby authorizes such officers and body to perform such other acts as may be necessary to carry out such proceedings, and to report back to the Board of Trustees their recommendations with respect to a decision concerning such faculty members terminations.
EXECUTED this 26th day of March, 1973."

30. This court originally issued a temporary restraining order restraining the holding of these hearings. This order was subsequently set aside on order of the Sixth Circuit Court of Appeals. However, the College agreed not to hold the P.E.R.A. hearings pending the disposition of this cause. TRO Proceedings at 100; Pre-Trial Brief on Behalf of Defendant, Lake Michigan Community College, at 3 (hereafter cited as Def. Pre-Trial Brief).

A.'s hearing and appeal requirements, the "terminations" of the plaintiffs were in legal effect "suspensions" until the final determination by the Board on the record made by its committee. In line with this argument, the defendants contend that the February 26 Resolution was in the nature of a rule or policy; that it was final as to no particular teacher; that the President of the College made the initial determination as to which individual teachers to "suspend," signalled by the letters of March 6; and that the hearings were for the dual purposes of inquiring into the merits of the President's determination and of finally terminating those judged to have violated the Act. The defendants are arguing that their institutional structure and course of action with regard to the striking teachers is closer to the ideal model of administrative due process than might appear on first impression. They are also suggesting, although they have not strenuously argued, that this cause is not ripe for adjudication.

The plaintiffs, on the other hand, argue that the February 26 Resolution by its own force operated as a final discharge from employment as of the end of March 5, subject only to the condition that the teacher had not returned to work. The scheduled hearings were thus post-discharge hearings, in the nature of a review of a decision which had already been made.

■■ When the parties dispute an interpretation or characterization of acts and events, the court ought to give great weight to the parties' contemporaneous interpretations and assumptions, insofar as these can be ascertained. The court finds the defendants' interpretation to be strained, and the plaintiffs' more in accordance with the intent of the actors and the effect of the actions on the parties and events. It is apparent that the defendants and other College administrators intended the word "termination" to have its ordinary meaning, that is, discharge or firing, not suspension.

The success of the College's recruitment of replacements depended in part upon the College's representations that the terminations were final. The replacements which were hired appear to have been treated as permanent. The plaintiffs likewise have assumed that they were finally terminated as of midnight March 5, and the defendants have done little to alter this assumption aside from verbal gestures in connection with the application of P.E.R.A. or in connection with this lawsuit.

■ The defendants can get little help from the general principles of administrative law or from the particular provisions of P.E.R.A. The February 26 Resolution cannot be fairly characterized simply as a "policy" or policy statement of the Board. The legislature had already laid down the general policy concerning economic strikes, at least, in P.E.R.A., so the Resolution laid down no new rule of conduct. It appears that those to whom the "policy" was to apply were sufficiently known and identified by the College authorities on February 26 so that it cannot be said that the "policy" applied to a general class of people whose composition shifted according to decisions made on grounds extraneous to the matter under consideration. The Chairman of the College Board testified that the Trustees "made a finding that those who were out at that time [February 26] were in violation of the law," [31] and, as noted, the College conceded that it intended the February 26 Resolution to operate as a permanent termination as of March 5, unless the strikers avoided the effect by returning to work at that time. Such a finding and effect are not characteristic of a general "policy" or of a legislative decision, but of an adjudicative decision, a judgment or decree. Under the circumstances, the application of the judgment to the individual strikers by the President on March 6 was in the nature of an execution of a judgment. Thus, the March 6 "termination" of the striking

31. Trial Tr. at 352.

faculty cannot be characterized as a mere "suspension," a step in the initiation of administrative action rather than an event of independent final significance. Similarly, the defendants' analysis does not logically, naturally, or necessarily flow from Section 6 of P.E.R.A. or from the relevant case law.

██ The court also finds that the relations between the top administrative officials and the Board of Trustees were extremely close. Mr. Richard Gates, a member of the Board, testified at the M.E.R.C. hearings that the Board gave no formal instructions to the administration concerning the College's bargaining position. Rather, Mr. Gates indicated that the administrators "usually" meet with the Board in executive session, and that after discussion a "consensus position" was developed.[32] Under these circumstances, there was certainly no separation of functions even remotely analogous to that which exists in large governmental administrative agencies between the prosecutorial and adjudicative divisions.

The court concludes that the February 26 Resolution operated to discharge the striking teachers as of midnight, March 5. The hearings which the College has proposed to conduct under P.E.R.A. are thus post-discharge hearings, in the nature of a review of action already taken.

After the beginning of the strike and the discharge of March 5, negotiations between the College and the Union continued intermittently with a view to resolving the issues and ending the strike. However, the Union and teachers effectively abandoned their strike as early as March 22, 1973. On that date, the Union delivered a "Corrected Copy for [sic.] Federation Proposal" to end the strike.[33] Point One was that all striking faculty members would immediately return to their former positions, and no reprisals would be instituted for striking by the College. The Proposal then added a face-saver for the Union. The Union proposed that if it prevailed before M.E.R.C. on the then-pending unfair labor practice charge, then the College would grant the factfinder's recommendations, reinstitute the previously bargained sections of the contract, and make other relatively minor changes. If the College prevailed on the unfair labor practice charge, on the other hand, the faculty would finally accept the College's freeze on salaries for the 1972–73 school year, and would guarantee a complete full semester's work for each student. "At the end of the current semester," the Proposal continued, "the status of each striking faculty member would revert to the present status."[34]

██ At trial, the head of the Union negotiating team testified that, while the total situation continued to be discussed, the offer to return to work was not conditioned on the College's full

---

32. Lake Michigan College, No. C73B–33, Proceedings before Trial Examiner of M.E.R.C. (March 19, 1973), at 14. [Hereafter cited as "M.E.R.C. Transcript."]
The Transcript of the Proceedings before Trial Examiner of M.E.R.C. is technically hearsay. However, the defendants did not make a hearsay objection at trial. They had adequate opportunity to cross-examine during the M.E.R.C. hearings, and the issues there were similar to those here, so they suffer no prejudice.

33. Jt.Ex. 12. On March 21, the Union had delivered its original proposal. Jt.Ex. 11. The corrected copy added the clause, "the librarians' and counsellors' loads will be equalized," to the list of changes the College would do in the event the Union prevailed on the unfair labor practice charge.

34. At trial, defendants contended that the "status" to which the Proposal referred was strike status, so that the Union was asking the College to accept a return to strike status in the event the College won before M.E.R.C. Trial Tr. at 130–131. Edward Shaffer, head of the Union's negotiating team, testified that "status" did not refer to strike status, Id. at 130, and the court cannot find that a Union against the wall would place such a harsh proposal on the table. Instead, the "present status" referred to the status of no collective bargaining agreement, no collective understanding, and no signed, written, individual teachers' contracts in hand. This sentence was merely an acknowledgment of an existing situation, a situation which was almost wholly beneficial to the College.

acceptance of the Proposal.[35] The striking teachers had obviously been defeated and were in fact prepared to return to work immediately, whether or not the College accepted the Union's face-saver. The only truly operative sections of the March 22 Proposal were those adding up to total surrender. Under the circumstances, the court concludes that the strike was fully abandoned by the teachers on March 22, 1973, and that the College knew this fact. The fact that the College refused to accept the return of its experienced teachers is evidence of a resolute plan to destroy the Union and to make its discharges stick.[36]

On March 29, 1973, Union and College negotiators met in a mediation session at the office of M.E.R.C. Chairman Robert G. Howlett in Grand Rapids. At that time, the College made the Union an offer to conclude a new three-year collective bargaining agreement. The M.E.R.C. Trial Examiner found that the College offered the Union as bargaining agent for those actively employed by the College, including the strike replacements, "more than had been previously offered across the bargaining table before the strike . . . in as much as the offer of March 29, in addition to the granting of the grid raise during the school year 1972–1973, included a cost-of-living increase during the years 1973–1974 and 1974–1975." [37] The offer also included a proposal that all faculty members who had been terminated because of engaging in a strike should re-

sign as of March 5, and the College would accept the resignations, thereby revoking the earlier terminations.[38] The Union rejected the College's proposal, and on April 2 made the proposal the basis of another (or, technically, an amended) unfair labor practice charge before M.E.R.C. The M.E.R.C. Trial Examiner accepted all the facts alleged in the Union's affidavit as correct. However, he concluded that the Union remained the exclusive bargaining agent for all the employees and that the College had the obligation "to make any offer toward achieving a collective bargaining agreement." [39] M.E.R.C. accepted the Trial Examiner's conclusion without comment.[40]

The March 29 offer was merely another attempt to embarrass and defeat the Union. Under Michigan labor law, the union is deemed to be the exclusive collective bargaining representative of the strike replacements, even though the replacements are not union members and have interests adverse to those who are. The Union's ties were naturally with the striking teachers. By making the Union a salary proposal for the replacements which the Union could not possibly accept, the College ensured that the Union would not be embraced as benefactor and protector by the replacements.

■ The College's reaction to this court's Order of April 30, 1973 is also reflective of the Board's general attitude toward the teachers. After suit was filed by the Union, this court ordered

---

35. Trial Tr. at 127.

36. The College insisted before this court that it did not understand the Proposal of March 22 and the attendant discussions to constitute an unconditional offer to return to work within the standards established by federal labor relations law. See, e. g., Trial Tr. at 49–50. The court does not believe the standards evolved in federal labor law apply to this aspect of the case.
The Union could not and did not draw its March 22 Proposal with reference to the rights guaranteed them and liabilities imposed upon them by federal labor law. However, considering the general policies of federal labor law as stated in the basic acts

and expounded by the N.L.R.B. and the courts, this court is not prepared to say that, under the circumstances, the March 22 Proposal was not an "unconditional" offer within the meaning of the federal law. Even under the strictest of standards, all possible doubt that the teachers had finally abandoned their strike was eliminated by the filing of the complaint with this court on April 6, 1973, and the discussions immediately subsequent thereto. See Trial Tr. at 128.

37. Def.Ex. 4 at 10.

38. Id. at 6.

39. Id. at 11.

40. Def.Ex. 9.

the College Trustees to "immediately reinstate and continue the teachers in their former position of employment at full compensation from the first day of May 1973 . . . . " In an effort to ensure cooperation between the returning teachers and the replacements so that the students would be protected, this court also ordered that the "reinstatement procedure be adjusted so as to avoid discontinuity of student studies and grading."

When the teachers returned to work under the court order on May 1, they were given a letter from the Executive Vice President of the College. The letter was addressed, "Dear Former Faculty Member," and it requested the teachers to sign a list of returnees. The letter continued, "Pursuant to an order of the Federal District Court, you will be placed on the College's payroll as of today. At this time you have not been assigned any duties, and you are to remain at home and await our call." [41]

This action by the College was a deliberate failure to execute the Order of this court in good faith. Sending the teachers home was designed to further frustrate and humiliate them. The order to "immediately reinstate and continue the teachers in their former position of employment" plainly *meant reinstatement to their former position* as *active* teachers. That part of the order which referred to an adjustment of the procedure to avoid discontinuity of student studies and grading was a mandate for cooperation, and could not be interpreted by any fairminded person as negating the reinstatement order.

The returning teachers properly and correctly thought they were supposed to assume their duties, and many went to their offices and classrooms. Naturally, some confusion developed, but, as testimony taken at trial showed, there were no serious incidents.

Having manufactured confusion by failing to execute the order of this court in good faith, the College exploited the resulting situation in the Court of Appeals. The counsel for the College filed an affidavit recounting information he had received by telephone from the Executive Vice President of the College. Counsel stated as follows: [42]

"3. He is reliably informed that the plaintiff-teachers herein, members of plaintiff Union, appeared en masse at the College campus this morning, forced their way into the students' classes then in session, either by physically ejecting the new instructors or stating to them that the former instructors (the plaintiff teachers) were there by Court order, and the new instructors were to leave immediately, and created a mass disturbance in the lounge by exciting students with statements that the College was in contempt of the District Court's order for not having immediately placed the former instructors back in their class rooms; and that several of the new instructors or old instructors who did not strike have left the campus under fear of violence and retaliation for their having worked during the strike since February 15, 1973.

4. He also is reliably informed that numerous students, as a result of such conduct, have left their classes, have stated their intentions not to return under these or any similar circumstances and/or are quitting their education at the College.

5. He also is reliably informed that the Board of Trustees of the College and its administration are seri-

---

41. Pl.Ex. 10.

42. Appeal from a Mandatory, Interlocutory Order of the United States District Court for the Western District of Michigan, Appendix at 237–238, Lake Michigan College Federation of Teachers v. Lake Michigan Community College, No. 73–8084 (6th Cir.). The Appendix was submitted here at the request of the Three-Judge Court. This affidavit was based substantially upon hearsay, twice removed, with inherent probability of error.

ously considering completely and finally closing the College under these disruptive circumstances."

The court concludes that counsel's affidavit represented a deliberate and gross exaggeration and misrepresentation of the true situation at Lake Michigan College on May 1, 1973. The College authorities were so determined to prevent even a temporary return of the striking teachers that they fabricated a vision of anarchy which was presented to the Court of Appeals in an attempt to influence a decision in their favor.

On July 3, 1973, there was another mediation session with the College and the Union, this time at the office of Employment Relations Commissioner Ellman in Detroit. At trial, the attorney for the defendants stated that the attorney for the plaintiffs said at the meeting that the strikers were now clearly offering unconditionally to return to work. The attorney for the plaintiffs stated that he really said that the strikers were now offering unconditionally to return to work since it apparently had not been clear to the College that such an offer had been made previously. The witnesses for the defendants tended to support the testimony of the defendants' attorney; the witnesses for the plaintiffs tended to support the testimony of the plaintiffs' attorney. There is no doubt that the plaintiffs made an unconditional offer to return to work on July 3. In view of the court's previous findings on the matter of the offer to return, the court does not need to resolve the question of what the plaintiffs' attorney actually said on July 3.

Section 6 of the P.E.R.A.[43] prohibits public employees, such as the teachers who are plaintiffs here, from engaging in strikes "for the purpose of inducing, influencing or coercing a change in the conditions or compensation, or the rights, privileges or obligations of employment." If the teachers have engaged in such a strike they may be discharged. P.E.R.A. operates to designate the College Board as the tribunal to determine whether the striking teachers violated the Act. That determination has not yet been made. Although the teachers have not denied that they were engaged in concerted action, both the Union and the teachers have denied that they engaged in a strike for the purpose of inducing, influencing or coercing a change in the conditions or compensation or the rights, privileges, or obligations of employment. Potentially, the Union and teachers have raised two separate major issues under P.E.R.A., one of law, and one of fact. The legal issue is whether there is a distinction in Michigan public employment relations law between an economic strike and an unfair labor practice strike, and if so, what the effect of distinction is.[44] The factual issue is whether the Union and teachers were engaged in an economic or an unfair labor practice strike. The court finds that under P.E.R.A. both the legal and factual issues are substantial and non-frivolous. The court does not and will not resolve these issues, for the only major question raised by the complaint for this court is whether, under all the circumstances, the Due Process Clause restricts the tribunal and the

43. M.C.L.A. Sec. 423.206.

44. In federal labor relations law, the question of whether the employees are engaged in an unfair labor practice rather than an economic strike is determined by trying before the N.L.R.B. the question of whether the employer in fact committed an unfair labor practice. However, the federal rule emerged from a statutory and policy context different from P.E.R.A. Section 6 of P.E.R.A. expressly requires an affirmative finding of the strikers' "purpose." It is possible that employees may be found to be on strike for the purpose of protesting an unfair labor practice even though no unfair labor practice has in Michigan law been committed by the employer, so long as the employees immediately return to work when M.E.R.C. makes such a finding. If *all* strikes are held to be prohibited, then the "purpose" clauses of Sections 1 and 6 are nugatory. The court makes no attempt to solve these problems of statutory construction.

time and manner in which these issues may be resolved.[45]

### B.

The legislative heart of Michigan public employment labor law is the Hutchinson Act, Mich.P.A.1947, No. 336, as amended, Public Employment Relations Act, P.A.1965, Nos. 379, 397, and P.A. 1973, No. 25.[46] M.C.L.A. Sec. 423.201 et seq., M.S.A. Sec. 17.455(1) et seq. P.E. R.A., in conjunction with other laws, establishes an institutional and legal framework which structures, influences, and to some extent controls the relations between some public employers, including the defendants and their employees. An understanding of this framework is essential to a proper analysis of the case presently before the court. As a practical .matter, the legal institutions and rules influenced the actions of the parties at every step in the developments which led to the filing of this suit. As a legal matter, all the major issues of this case can be intelligently resolved only with continuing reference to Michigan labor law.

■ An overview of P.E.R.A. reveals that its fundamental purpose is to create a balance between the public employer and the public employee in the matter of labor-management relations in order to foster an equitable adjustment of interests and to ensure fundamental fairness to all concerned. As Justice Frankfurter put it, "[t]*he heart of the matter is that democracy implies respect for the elementary rights of men . . . ; a democratic government must therefore practice fairness . . .*" Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 170, 71 U. S.Ct. 624, 647, 95 L.Ed. 817 (1951). (Concurring Opinion.) (Emphasis supplied.) Thus, employees are forbidden to strike,[47] but as a necessary *quid pro quo* employers are under an especially strong duty to bargain in good faith.[48] This duty is certainly imposed by P.E.R.A. itself. This construction of P.E.R.A. follows not only from the express words of the Act, but also from the traditional assumption that the state's lawmakers intended to comply fully with the obligations imposed by the Due Process Clause of the Fourteenth Amendment. Speaking to the similar problem of procedural guarantees afforded federal employees, the United States Supreme Court has said, "Where administrative action has raised serious constitutional problems, the Court has assumed that Congress or the

---

**45.** Since the court is not called upon to determine either the purpose or legal validity of the teachers' strike, this case is vastly different from Bennett v. Gravelle, 323 F. Supp. 203 (M.D.Md.), aff'd. 451 F.2d 1011 (4th Cir. 1971), cert. dism. 407 U.S. 917, 92 S.Ct. 2451, 32 L.Ed.2d 692 (1972). There, several public employees went on strike, allegedly to protest the employer's racially discriminatory policies, and these employees asked the court to create a substantive constitutional exception to the state's public employee no strike policy. The court refused to create an exception based upon the alleged purpose of the strike.

**46.** Most of the events having significance for this lawsuit occurred before the effective date of P.A.1973, No. 25, June 14, 1973. Consequently, P.E.R.A. as amended through 1965 applied at the time the present controversy arose. The 1973 Act did not amend Sec. 6 of P.E.R.A., M.C.L.A. Sec. 423.206, the provision which has primary impact upon this case.

**47.** M.C.L.A. Sec. 423.206, quoted in full, infra, n. 52.

**48.** M.C.L.A. Sec. 423.215 reads in pertinent part: "A public employer shall bargain collectively with the representatives of its employees . . . . For the purposes of this section, to bargain collectively is the performance of the *mutual obligation of the employer and the representative of the employees* to meet at reasonable times and *confer in good faith with respect to wages, hours, and other terms and conditions of employment,* or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract, ordinance or resolution incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession." (Emphasis supplied.)

President intended to afford those affected by the action the traditional safeguards of due process. [Citations omitted.] These cases reflect the Court's concern that traditional forms of fair procedure not be restricted by implication or without the most explicit action by the Nation's lawmakers . . . ." Greene v. McElroy, 360 U.S. 470, at 507–508, 79 S.Ct. 1400, at 1419, 3 L.Ed.2d 1377.

The state agency principally concerned with public employment relations is the Michigan Employment Relations Commission (formerly called the Labor Mediation Board and here referred to as M.E.R.C.), composed of three members. M.C.L.A. Sec. 423.3. M.E.R.C. does not have exclusive jurisdiction in this area, since both public employers and the state courts also have extensive jurisdiction in particular circumstances.

Public employees are given the right to organize and to engage in lawful concerted activities for the purpose of collective bargaining. M.C.L.A. Sec. 423.209. Under the auspices of M.E.R.C., machinery is established for the definition of appropriate bargaining units, M.C.L.A. Sec. 423.213, and for the selection, certification, and decertification of colllective bargaining agents. M.C.L.A. Secs. 423.212, 423.214.

Procedures and services are established whereby M.E.R.C. may assist in the resolution of public employment disputes. The basic tools are mediation, M.C.L.A. 423.207, and factfinding, M.C.L.A. Sec. 423.25.

Public employers and labor organizations and their agents are specifically prohibited from engaging in certain enumerated unfair labor practices.[49] M.C.L.A. Sec. 423.210. M.E.R.C. is given jurisdiction to hear unfair labor practice charges and to issue cease and desist orders, which are enforceable by the Court of Appeals. Any person aggrieved by a final order of M.E.R.C. granting or denying relief may likewise seek review in the Court of Appeals. M.C.L.A. Sec. 423.216.

Since the original enactment of P.E.R.A. in 1947, strikes by public employees have been statutorily prohibited.[50] However, the relevant language of the Act, which has been the same since 1947, creates some doubts as to whether all strikes are proscribed. The Act specificaly prohibits concerted work stoppages "for the purpose of inducing, influencing or coercing a change in the

49. Before the adoption of the 1973 amendment, P.E.R.A. did not expressly prohibit unfair labor practices by unions, and M.E.R.C. had no jurisdiction in this area.

50. The 1965 version of the basic no-strike provision, in force when this case arose, reads as follows:
"Sec. 1. As used in this act the word 'strike' shall mean the concerted failure to report for duty, the wilful absence from one's position, the stoppage of work, or the abstinence in whole or in part from the full, faithful and proper performance of the duties of employment, for the purpose of inducing, influencing or coercing a change in the conditions, or compensation, or the rights, privileges or obligations of employment. Nothing contained in this act shall be construed to limit, impair or affect the right of any public employee to the expression or communication of a view, grievance, complaint or opinion on any matter related to the conditions or compensation of public employment or their betterment, so long as the same is not designed to and does not interfere with the full, faithful and proper performance of the duties of employment."
The current no-strike provision, M.C.L.A. Sec. 423.201 (West's Michigan Legislative Service 1973 at 82) is not significantly different from the earlier version.
Except for the 1965 addition of the word "concerted" before the words "failure to report for duty . . . ." apparently in order to make Sec. 1 parallel Sec. 6 (see infra, n. 52), neither the 1965 nor the current provision is significantly different from the Hutchison Act's prohibition, P.A. 1947, No. 336, Sec. 1. The constitutionality of Sec. 1 was upheld in City of Detroit v. Division 26 of Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America, 332 Mich. 237, 51 N.W.2d 228 (1952). The constitutional authority of the state to prohibit public employee strikes is not an issue in the case presently before the court.

conditions, or compensation, or the rights, privileges, or obligations of employment." Assuming there are meaningful distinctions between economic strikes and unfair labor practice strikes —and federal labor law certainly draws such distinctions, see, e. g., Mastro Plastics Corp. v. N.L.R.B., 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956), the Act leaves substantial doubt as to whether the unfair labor practice strike falls within the statutory prohibition. No Michigan cases directly on this point have been cited to this court, or found.[51]

Under the provisions of the original Hutchinson Act, a public employee was "deemed to be on strike" when he engaged in *any* concerted work stoppage, regardless of its purpose. P.A.1947, Sec. 6. Discharge of striking employees was mandatory, automatic, and immediate, with the strikers losing all pension and retirement benefits in addition to their jobs. Id. Sec. 4. However, the discharged employee was entitled, on request, to a hearing before the public employer wherein he could establish that he did not violate the provisions of the Act.

Id. Sec. 6. Because discharge was legally automatic and immediate at the commencement of the strike, the hearing was necessarily held after discharge. The employee could have an adverse decision reviewed by the Labor Mediation Board. Id. Illegal strikers could be reemployed by the public employer, but their salary on re-employment was limited by law, and they were placed on a two-year statutory probation. Id. Sec. 5.

The 1965 amendments, P.A.1965, Nos. 379, 397, significantly altered the scheme. While retaining the basic prohibition on strikes by public employees, the amendments repealed those provisions requiring the discharge of strikers and limiting the terms of their re-employment. The employer was given the option of imposing no discipline on illegally striking employees, or of imposing any appropriate discipline up to and including discharge.[52]

The 1965 amendment retained the basic Section 6 employee right to a hearing before the employer in the event of a work stoppage and the employer's

---

51. It can be argued that by not specifically including unfair labor practice strikes within the express prohibitions of P.E.R.A., Secs. 1 and 6, the legislature intended to legalize or permit such strikes. On the other hand, it may also be argued that P.E.R.A. contemplates no distinction between economic and unfair labor practice strikes, or that if unfair labor practice strikes are outside the statute, then the common law prohibition on such strikes applies.

52. The 1965 version of Sec. 6 of P.E.R.A., which is still in effect, M.C.L.A. Sec. 423.-206, reads as follows:

**423.206** *Same; deemed on strike; proceeding to determine violation of act; decision, review*

Sec. 6. Notwithstanding the provisions of any other law, any person holding such a position who, by concerted action with others, and without the lawful approval of his superior, wilfully absents himself from his position, or abstains in whole or in part from the full, faithful and proper performance of his duties for the purpose of inducing, influencing or coercing a change in the conditions or compensation, or the rights, privileges or obligations of

employment shall be deemed to be on strike but the person, upon request, shall be entitled to a determination as to whether he did violate the provisions of this act. The request shall be filed in writing, with the officer or body having power to remove or discipline such employee, within 10 days after regular compensation of such employee has ceased or other discipline has been imposed. In the event of such request the officer or body shall within 10 days commence a proceeding for the determination of whether the provisions of this act have been violated by the public employee, in accordance with the law and regulations appropriate to a proceeding to remove the public employee. The proceedings shall be undertaken without unnecessary delay. The decision of the proceeding shall be made within 10 days. If the employee involved is held to have violated this law and his employment terminated or other discipline imposed, he shall have the right of review to the circuit court having jurisdiction of the parties, within 30 days from such decision, for determination whether such decision is supported by competent, material and substantial evidence on the whole record.

actual or proposed exercise of the power to discipline or discharge. However, at least three important changes were made. First, whereas under the old Section 6 an employee was deemed to be on strike when he engaged in *any* concerted work stoppage, he now was deemed to be on strike only when he engaged in a concerted work stoppage *for the purpose of achieving economic goals.* This amendment had the effect of importing the basic ambiguity of P.E.R.A. with regard to unfair labor practice strikes into Section 6.

██ Second, while the original Act provided that a discharged employee would "be entitled . . . to establish that he did not violate the provisions" of the Act, P.A.1947, No. 336, Sec. 6, the amended version entitled the disciplined employee "to a determination as to whether he did violate the provisions" of the Act, with review of a decision adverse to the employee in the Court of Appeals, "for determination whether such decision is supported by competent, material and substantial evidence on the whole record." M.C.L.A. Sec. 423.206. The amended version contemplates a significant shift in the nature of the hearing before the employer. Originally, any concerted work stoppage created a rebuttable presumption that the employee was illegally striking, and the employee had the burden of asserting affirmative defenses to negative this presumption. Under the new provision, the presumption of illegality is removed for the purposes of the hearing, and the employer is given the obligation of establishing an employee violation by competent and material evidence.

██ Finally, the 1965 repeal of the mandatory discharge provisions combined with changes in the language of Section 6 to eliminate the original definiteness as to the *timing* of the employer's discharge hearing. Under the 1947 Act, the hearing was necessarily after discharge. The 1965 version does not state explicitly whether the employer's hearing is to be before or after discharge, and the scheme of the amended Act can accommodate either alternative. M.C.L.A. Sec. 423.206. It seems settled that Section 6 does not preclude a postdischarge hearing, cf. School District for the City of Holland v. Holland Education Association, 380 Mich. 314, 157 N.W.2d 206, 210 (1968), and no Michigan case has been found holding or even suggesting that the statute precludes a pre-discharge hearing. Although a hearing must be held by the employer on timely request, the *timing* of the hearing is within the discretion of the employer, so long as the hearing is commenced no later than ten days after the request.[53]

██ Discipline or discharge of striking employees is not the sole remedy available to public employers faced with a strike. The Supreme Court of Michigan has held that the state circuit courts have equity jurisdiction to enjoin strikes by public employees. However, injunctions are not to issue upon a mere showing that prohibited concerted activity has taken place. *Rather, under the usual principles of equity, the circuit court should inquire as to whether there has been violence, irreparable injury, or breach of the peace, and, under the "clean hands" doctrine, whether the employer has bargained in good faith.* School District for the City of Holland, surpa, 157 N.W.2d at 210, 211.

██ M.E.R.C. has no jurisdiction to remedy illegal strikes by public employees. This lack of jurisdiction, especially when coupled with the ambiguous position of the public employee unfair labor practice strike in Michigan law, sometimes puts M.E.R.C. in an awkward

---

53. The court understands that it was on this interpretation of P.E.R.A. that the majority of the three-judge panel decided that the constitutionality of P.E.R.A. was not sufficiently implicated in this suit to require a three-judge court under 28 U.S.C. Secs. 2281, 2284.

situation. For example, in the case before the court, the Union filed unfair labor practice charges against the public employer with M.E.R.C. on February 14, 1973, and went on strike on February 15, 1973, allegedly solely to protest the employer's unfair labor practice. The employer terminated the striking employees for carrying on an economic strike as of March 5. A hearing was held before the M.E.R.C. Trial Examiner on March 19.[54] The Trial Examiner found for the employer on July 2,[55] and the full Commission likewise found for the employer on February 25, 1974.[56]

It is apparent that M.E.R.C. nominally had before it only the unfair labor practice charge against the employer, but that in reality an additional issue was the legitimacy of the employees' strike. If M.E.R.C. found that the employer had committed significant unfair labor practices, then the union could more plausibly argue to the courts and the public that its strike was not illegal and that in any case the equities were with it and the employees as the wronged parties. In this situation, M.E.R.C. would appear to be compromising the general legislative policy against public employee strikes, and infringing upon the jurisdiction of the public employer to determine the legality of a strike by its employees.[57] On the other hand, a finding of no unfair labor practice would be more apparently supportive of the general legislative prohibition on strikes, would make it much more difficult for the union to raise troublesome questions about the validity of unfair labor practice strikes, and would not appear to infringe upon or compromise the employer's jurisdiction to determine the legality of the strike and the appropriate remedy, if any.

## C.

The procedural history and present posture of this case are of some importance.

Plaintiffs filed their original complaint on April 6, 1973, alleging infringements of their Due Process rights by the defendants, and requesting a temporary restraining order and preliminary and permanent injunctive relief. This complaint was subsequently amended.

After a hearing, the single district judge to whom the case had been assigned issued a temporary restraining order. On appeal, the United States Court of Appeals for the Sixth Circuit ordered the temporary restraining order set aside and vacated.

Meanwhile, the defendants in this cause filed a motion for the convening of a three-judge court pursuant to 28 U.S.C. Secs. 2281 and 2284. In due course, the Chief Judge of the United States Court of Appeals for the Sixth Circuit convened such a court, stating that the three-judge court would have jurisdiction to determine whether a three-judge court was required in this case. After hearing arguments on the issue, the original three-judge panel did not finally decide that a three-judge court was required, but concluded that the matter should proceed before three judges, with a final decision to be made after all evidence and arguments had been submitted. Subsequently, one member of the three-judge panel recused himself and a substitute was appointed. A majority of this reconstituted panel then decided that the case was not required to be heard by three judges, on the grounds that "this is not a case in which an injunction is sought to restrain the operation of a state statute on

---

54. M.E.R.C. Transcript.

55. Lake Michigan College, No. C73 B–33, Decision and Recommended Order of Administrative Law Judge (July 2, 1973). Def.Ex. 4.

56. Lake Michigan College, Case No. C73 B–33 (M.E.R.C. Feb. 25, 1974). Def.Ex. 9.

57. Cf., Saginaw Township Bd. of Ed., 1970 M.E.R.C. Lab.Op. 127.

the ground that it is repugnant to the United States Constitution but is instead an action for remedial relief for an allegedly unlawful discharge from employment . . . ."[58] Accordingly, an order dissolving the three-judge court and remanding the case to the single district judge was entered.

The district judge to whom the case was remanded had sat on the original and reconstituted three-judge panels, and he dissented from the order to dissolve the three-judge court. He thought the P.E.R.A. might be sufficiently implicated in the case to require the special panel, and thus thought that three judges ought to hear the case and then make a final decision on the three-judge court issue.[59]

Because of the impact of 28 U.S.C. Secs. 2281 and 2284 on this case, the court cannot examine the constitutionality of P.E.R.A. itself, and does not presume to do so. Rather, the court confines itself strictly and narrowly to the facts of this particular case. The court does not reach or call into question the constitutionality of the state policy and statutory scheme of P.E.R.A.

A hearing on the merits was held on March 14 and 15, 1974. The court now turns to the basic legal issues before it.

## II.

■ American government at all levels is carefully designed to be strong enough to serve its positive purposes, yet at the same time is constitutionally limited so that strong, positive government does not and cannot lead to tyranny. The foundation stone of constitutional limitations is the Due Process Clause in the Fifth and Fourteenth Amendments of the United States Constitution. The Due Process Clause of the Fourteenth Amendment, specifically invoked by the plaintiffs here, provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." The basic purpose of the Due Process Clause is to ensure that governmental action which affects important interests of citizens shall be objectively rational and substantively just, insofar as possible in this imperfect and complicated world. Thus, in appropriate cases, courts inquire as to whether particular governmental actions have a rational basis or whether they are arbitrary and capricious.

⌊19⌋ In its procedural dimension, the Due Process Clause assumes that governmental decisions affecting the interests of citizens will more often than not be rational and just when made by suitably objective persons following orderly procedures. This assumption rests on the faith that governmental officials will pursue a proper course of action if given a chance to do so. It is the product of many centuries of Anglo-American constitutional and legal development.

■ Because the Due Process Clause applies to such a wide variety of activities and situations, the question of whether the government has provided due process depends upon the circumstances of each individual case. The resolution of a Due Process issue necessarily involves the careful analysis of the various governmental and private interests involved, and the making of the most delicate and sensitive accommodations in light of the basic purposes of the Due Process Clause.

The case presently before the court concerns an employment dispute in the public sector. In some respects, public employment disputes are no different from private disputes. *Certainly the ultimate interest of both employer and employee lies in keeping the agency or institution operating, and in this lies the basis for final compromise and agreement at contract time.*

However, the people and the legislature of Michigan apparently believe that the public sector is sufficiently different from the private to require the statutory proscription of strikes by public em-

---

58. Order Dissolving Three-Judge Court, App. B.

59. Id.

128

ployees. It is presumed, rightly or wrongly, that the proscription is necessary to protect essential public services and because public agencies are neither imbued with the profit motive nor subject to the discipline of the market.[60] Moreover, some believe that a strike against a public employer is a symbolic attack upon the government and the public.

The legal proscriptions on strikes by public employees do not mean that public managers are given uncontrolled discretion over employee relations. On the contrary, quite apart from statutory relations, the concept of justice implicit in the Due Process Clause requires *that public managers assume an extra duty to act fairly and equitably with respect to the employees under their supervision. While a departmental budget may be gratifyingly low, the public's business will not be done efficiently if the employees are treated harshly and unfairly and are denied effective means of redress for their genuine grievances.* Of course, if an individual employee is truly inefficient, dishonest, or otherwise a poor worker, due process will not stand in the way of discipline or discharge.

It is especially important to the calculus of this case that public employees are not mechanical units which can be moved in and out of their positions with no substantial damage to themselves,

their families, and the larger social groups of which they are a part. As Justice Douglas recently said, *"Employability is the greatest asset most people have,"* Sampson v. Murray, 415 U.S. 61, 95, 94 S.Ct. 937, 955, 39 L.Ed.2d 166 (1974) (dissenting opinion; emphasis supplied), and that is emphatically true of the teachers who are plaintiffs in the present case. In order to teach most subjects at Lake Michigan College, at least before February 1973, it was almost always necessary to have earned a master's degree or more. For most people, such advanced training can be acquired only with great expenditures of time and money. Moreover, such training is highly specialized, reducing to a substantial degree the ability of a person to move into new occupational fields, and increasing the person's *dependency* upon a rather narrow demand sector. This case arose in a period of high inflation and in a period of retrenchment for education nationally. Thus, as appeared at trial, several teachers who were discharged by the College in 1973 were unable to find suitable employment and were utterly ruined financially and grievously hurt psychologically. Any calculation of fundamental fairness in this case must take account of these human and economic realities.[61]

With this general introduction, the court may move to a more detailed examination of the legal issues raised in this case.

60. It is often assumed that the absence of a market in the public sector means the absence of a restraint on employees which is present in the private sector. However, the absence of such a market and of the profit motive also frees the public manager from pressures which in the private sector counsel flexibility and compromise in dealing with employees and unions. The stock in trade of the politicians who act as public employers is not money, or at least not their money, but power. Many contract demands and most strikes are challenges to politicians' power, and may be more stoutly resisted for this reason.

61. During the first part of the twentieth century, American courts read a "liberty of

contract" into the Due Process Clause in order to strike down legislation designed to ameliorate the lot of workers who were grievously exploited by management. The assumption was that a single employee was in fact free and able to bargain effectively with his corporate employer. As the century progressed, more and more people came to see that the courts' factual assumption was wrong, and that the constitutional law built on the theory of liberty of contract was bad law and bad policy. If this court were to ignore the human and economic realities of today's employment market, and assume a free or even moderately free job mobility, it would be repeating the mistakes of the early twentieth century.

## A.

The Due Process guarantees of the Fourteenth Amendment protect, among others, liberty and property interests. Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed. 548 (1972); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). In Roth, the Supreme Court set forth guidelines for the determination of whether plaintiffs possess protected property interests: [62]

"Certain attributes of 'property' interests protected by procedural process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. *It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.*

Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law —rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." 408 U.S. at 577, 92 S.Ct. at 2709. (Emphasis supplied.)

Plainly, the Court recognized that the drafters of the Fourteenth Amendment did not intend that every person whose interests were touched by government should have a federal case merely because he believed himself aggrieved. On the other hand, the Court did not adopt an unduly narrow or crabbed interpretation of "property." When one has a claim of entitlement which is legitimated by some objective rule, understanding, or situation external to one's self, and which is created, fostered, or deliberately acquiesced in by the state, then he has a property interest protected by the Due Process Clause.

Do the plaintiffs in this case have a property interest which is protected by the Due Process Clause? Put somewhat differently, the issue is whether the Due Process Clause limits in any way the procedural means by which the state may enforce its public employee no-strike provisions against both tenured or non-probationary and non-tenured or probationary employees.

All the recent leading federal cases considering the extent of protected property interests of public employees have involved the disciplining or effective discharge of individual employees by administrators acting in the ordinary course of operations. Roth, supra; Sindermann, supra; Arnett, supra; Orr v. Trinter, 444 F.2d 128 (6th Cir. 1971); see also, Blair v. Board of Regents, 496 F.2d 322 (6th Cir. 1974), and cases cited at 324.

However, an employment dispute which results in a strike by nearly all of an institution's employees is both quantitatively and qualitatively different from a situation involving only an individual employee. In Michigan, the legislature has established a framework for handling employment relations and disputes, including provisions for collective bargaining and provisions imposing rights and duties on both employers and employees. Most of these provisions apply whether or not a collective bargaining contract is in existence between the employer and the union, and irrespective of the tenure status of individual employees. In the case presently before the court, the tenure status of nearly all of the individual plaintiffs has little or

62. Liberty interests are discussed infra.

no functional relationship to the merits of the dispute.[63]

■ In Arnett, supra, Justice White summarized the results of prior cases: "[T]o determine the existence of the property interest, . . . one looks to controlling law . . . ." 416 U.S. at 185, 94 S.Ct. at 1659. Justice White added that he understood that six members of the court agreed with this proposition. Id. Here, the "controlling law" is P.E.R.A. The court thus concludes that the appropriate reference is not the contractual tenure status of each individual employee, but the provisions of Michigan's Public Employment Relations Act.

Section 2 of P.E.R.A., M.C.L.A. Sec. 423.202, defines "public employee" as a "person holding a position by appointment or employment . . . in the public school service . . . ." The Michigan Supreme Court has applied this section to public school teachers at least twice. School District of the City of Garden City v. Labor Mediation Board, 358 Mich. 258, 99 N.W.2d 485 (1959); School District of the City of Holland, supra. In the first of these cases, a school district contended that the Labor Mediation Board had no jurisdiction to mediate salary disputes between the district and the teachers since there was no written contract in effect. The Court rejected this argument Garden City, 99 N.W.2d at 487–488. In the second of these cases, a teachers' union argued that because no contracts of employment were in force between the teachers and the district, the teachers could not be employees as a matter of law, and the no-strike provision of Section 6 could therefore not apply to them. The Court again rejected the argument. Citing Garden City, the Court said:

"Since this Court concluded that there is jurisdiction to mediate grievances 'in advance of the determination of salary provisions,' it follows that such jurisdiction would necessarily attach in advance of the executing of the written contracts themselves, which are required in the case of teachers, by the School Code.

If teachers as we have held are subject to the provision of the Hutchinson Act dealing with the mediation grievances in advance of signing written contracts, we can hardly hold with consistency that they are not subject to the no-strike provision of the same act for the same reason. We are constrained to hold that appellants were 'employees' within the terms of the act." School District for the City of Holland, 157 N.W.2d at 209.

■■ Here, all parties agree that P.E.R.A. applies. Under the decisions of the Michigan Supreme Court, all the teachers are "public employees" irrespective of the existence or terms of a collective bargaining agreement, or of an "understanding," or of individual contracts or terms of employment. In order for P.E.R.A. to apply at all, and in order for Lake Michigan College to be able to proceed to discharge the teachers under the authority of P.E.R.A., the teachers must continue to be "public employees." Although before termination a striking public employee will usually not enjoy all the benefits and prerequisites of normal employee status, by necessary implication of P.E.R.A., he retains a legitimate entitlement to his job and also an enforceable right to engage in protected concerted activities, M.C.L.A. Secs. 423.209, 423.210, 423.216.

■ All the plaintiffs in this case thus have property interests cognizable

---

63. Bates v. Dause, 502 F.2d 865 (6th Cir. 1974), is also different from the present case. In Bates, two tenured public school principals who had verbally supported a strike by public school teachers received a disciplinary demotion to teaching positions. The disciplined employees challenged their demotion on First Amendment grounds, and also raised a pendent state law claim. There was no procedural due process claim in the case, nor did the Sixth Circuit consider the extent to teachers' protected property rights under the Due Process Clause.

by the Due Process Clause. Any individual who is a "public employee" by statutory definition plainly has a cognizable property interest when an alleged violation of a substantive prohibition of the statute is sought to be redressed by a statutorily-authorized deprivation of the interest through discharge for cause.[64]

■ Under the circumstances of this case, a substantial number of teachers have a "property interest" sufficient to implicate the Due Process guarantees of the Fourteenth Amendment quite apart from P.E.R.A. As observed above, many of the teachers áre highly trained and highly specialized. Such training was often originally required for employment at Lake Michigan College, and additional training was at least encouraged by the terms of the negotiated salary schedule. This training had the effect of reducing to a substantial degree the occupational mobility of the teachers. In addition, many of these teachers had a great deal of teaching experience, and many years of service to the public and to the College. Experienced, highly trained, professional teachers most certainly relied upon their jobs in their daily lives, and, under all the circumstances, had a legitimate expectation, induced by Lake Michigan College and the state, that their position and reliance would not be "arbitrarily undermined," but would, at a minimum, be protected by the procedural guarantees of the Constitution. Roth, supra, 408 U.S. at 577, 92 S.Ct. 2701.

■ This discharge of the striking faculty as of midnight March 5, 1973, by the action of the Lake Michigan College Board of Trustees and administration was clearly a deprivation of the teachers' protected property interests.[65]

■ In addition to property, the Due Process Clause protects liberty. Liberty interests include a person's stake in his "good name, reputation, honor, or integrity," and his related ability to take advantage of employment opportunities. Roth, supra, 408 U.S. at 573, 92 S.Ct. at 2707.

■ It is clear in this case that the teachers' liberty interests are strongly implicated. The teachers are accused of breaking state law, and Lake Michigan College has already imposed the maximum penalty allowed by law, forfeiture of their jobs. In a society which values law and order, a finding by a state agency that a person has broken the law is *per se* an infringement of the person's interests in his "good name, reputation, honor, or integrity," and is in itself a stigma which strongly tends to foreclose his freedom to take advantage of other employment opportunities, at least where the finding is widely publicized and is coupled with the imposition of a severe statutorily authorized penalty.[66]

64. This is to say only that procedural due process limitations apply to the state's enforcement of the substantive prohibitions of P.E.R.A. In the ordinary course of a school's administration where the focus is on individual teachers and there is no serious labor dispute, individual contracts and terms of employment remain significant in determining the existence or absence of a cognizable property interest. Roth, supra; Sindermann, supra.

65. Although all the discharged teachers are entitled to a fair hearing on the issue of whether their conduct was illegal under P.E.R.A., a finding that their conduct was not illegal will not necessarily entitle all teachers to the same remedy. Since the scope of the remedy relates to the scope of the deprivation, those teachers on probationary status at the time of the discharge may be entitled to lesser relief than the full status teachers.

66. In Blair, supra, the United States Court of Appeals for the Sixth Circuit held that the failure of a school system to renew the contract of a teacher on grounds of failure to meet minimum standards in his relationships with students did not so implicate his liberty interests as to require a hearing under the Due Process Clause. However, the present case is clearly distinguishable from Blair, since there the discharged teacher was not charged with breaking the law. Also, Blair was a "one-to-one" relationship and not a group employment problem.
In a dictum in Roth, supra, the Supreme Court said of the hearing required when a state deprives a person of a liberty interest, "The purpose of such . . . hearing is

■ The court finds that the defendants' accusations against and discharge of the teachers in this case constitute a deprivation of the teachers' protected liberty interests.

### B.

■ Where the state seeks to deprive a person of a protected liberty or property interest, it must provide the person with an opportunity to be heard at a meaningful time and in a meaningful manner. Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). As in other cases, where the deprivation is by a state agency or administrative unit, *"an impartial decision maker is essential."* Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970); see also, Pickering v. Board of Education, 391 U.S. 563, 578–579 n. 2, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Morrissey v. Brewer, 408 U.S. 471, 485–488, 92 S.Ct. 2593, 33 L. Ed.2d 484 (1972); Gibson v. Berryhill, 411 U.S. 564, 578–579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); Arnett, supra, 416 U.S. at 197–200, 94 S.Ct. 1633 (White, J., concurring opinion); cf., Wong Yang Sung v. McGrath, 339 U.S. 33, 36–45, 70 S.Ct. 445, 94 L.Ed. 616 (1950). (Emphasis supplied.)

■ In this case, very serious factual issues are to be resolved by the administrative tribunal. The teachers are accused of breaking the law, and the tribunal must determine whether each teacher engaged in a work stoppage in concert with others "for the purpose of inducing, influencing or coercing a change in the conditions or compensation, or the rights, privileges or obligations of employment." M.C.L.A. Sec. 423.206. The legal position of the unfair labor practice strike in P.E.R.A. is also implicated. Clearly, considering the importance of the deprivations involved and the nature of the issues to be decided, the teachers are entitled to an *impartial decision maker.*

Where the issue is whether a particular tribunal is impartial, the Supreme Court usually does not itself make or otherwise mandate an initial inquiry into the existence of actual bias. Rather, starting from basic assumptions concerning ordinary human nature, the Court examines institutional patterns and personal involvement and interests to determine whether, under the circumstances, a constitutional "presumption of bias" attaches. If it does, then the decision maker is ordinarily disqualified. Ward v. Village of Monroeville, 409 U.S. 57, 61, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). As Justice Black wrote for the Court:

Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that "Every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the State and the accused, denies the latter due process of law." Tumey v. Ohio, 273 U.S. 510, 532 [47 S.Ct. 437, 444, 71 L.Ed. 749]. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to

---

to provide the person an opportunity to clear his name. Once a person has cleared his name at a hearing, his employer, of course, may deny him future employment for other reasons." 408 U.S. at 573, n. 12, 92 S.Ct. at 2707. The implication is that when a person is discharged on a basis which infringes his liberty interest, he is entitled to a hearing at which he may establish the falsity of the charges against him. If he does establish his innocence, then he must be reinstated unless the employer has other substantial and clearly distinct reasons for discharging him.

perform its high function in the best way "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14 [75 S.Ct. 11, 13, 99 L.Ed. 11].

In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955).

More generally, Justice Frankfurter once observed that "a democratic government must . . . practice fairness; and *fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights.*" McGrath, supra, 341 U.S. at 170, 71 S.Ct. at 647 (concurring opinion) (emphasis supplied).

■ It is arguable that under the circumstances of the case presently before the court, the constitutional presumption of bias attaches and that it requires the disqualification of the defendants as decision makers. However, the court does not consider and does not reach the question of the presumption of bias because it believes it is precluded from doing so by its truncated jurisdiction. P.E.R.A. states that the termination hearing is to be held by the "officer or body having power to remove or discipline" the striking employee. M.C.L. A. Sec. 423.206. Although all educational and other governmental institutions in Michigan are not similar to Lake Michigan College in size and division of authority, a substantial number are. If this court attempted to grant injunctive relief on the basis of a finding that the presumption of bias ought to attach because of institutional factors, the court would most probably be outside its jurisdiction. 28 U.S.C. Sec. 2281.

Accordingly, the court asks only whether the Lake Michigan College Board of Trustees is actually biased as a matter of fact under the circumstances of this case. The court expresses no opinion as to whether the Board of Trustees might be disqualified for bias in any case other than the one presently before the court.[67]

In order to determine whether the defendants are actually biased in this case, the court has had to explore many of the matters canvassed by M.E.R.C. in connection with the plaintiffs' unfair labor practice charge against the defendants. Of course, this court has no jurisdiction to review M.E.R.C.'s decisions, and does not do so. It is obvious that although they overlap the questions of actual bias and of unfair labor practices are substantially different. An employer might be guilty of an unfair labor practice and still be unbiased under the Due Process Clause. The converse might also be true.

The court notes parenthetically that although Michigan law gives M.E.R.C. exclusive jurisdiction over the issue of employer unfair labor practices under P.E.R.A., a state court may inquire as to the fairness of an employer's labor practices on general equitable principles when a case requires it. School District for the City of Holland, supra. The question of bias is properly before this court, and to the extent that the court examines some of the same factors that M.E.R.C. has previously explored, the court is merely following a course established in Michigan law.

Bias is a state of mind, a mental attitude or orientation with respect to specific parties in a specific situation. Where the concern is with future action, the question of bias is largely coincidental with that of motive. The existence of bias, like the existence of other states of mind, can only be inferred from observable acts and situations. Although some biases arise from acquired and relatively constant prejudices towards groups or classes of people, one form of bias is an ad hoc occurrence, the product of special "circumstances and relation-

---

67. The plaintiffs have requested back pay. Assuming such an award is in the nature of damages, one subject of inquiry is whether the defendants have acted in good faith. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). All or nearly all of the factual elements having a bearing on the issue of actual bias also have a bearing on the issue of "good faith."

ships." Cf., Murchison, supra, 349 U.S. at 136, 75 S.Ct. 623. It is the latter type of bias which is allegedly present in this case. The court must determine from an examination of the circumstances and relationships of the parties whether the Lake Michigan College Board of Trustees is biased, or whether it is capable of objectively evaluating the evidence in the proposed P.E.R.A. hearing on the subject of the legality of the teachers' work stoppage.

▉ The court has found, supra, that in early February 1973, the College acted with the ultimate goal of breaking the Union and with the immediate goal of provoking the strike which began on February 15, 1973.[68] After the strike began, the College embarked upon a program to finally discharge the striking teachers as a part of the plan to break the Union, and the College has not deviated from this course since. Not only did the College finally discharge the striking teachers, but it also hired permanent replacements. Even in the absence of any plan to break the Union, the College's commitment to the permanent replacements gives it a stake in upholding the discharge of the striking teachers.

Under these circumstances, the court concludes that the College Board of Trustees is actually biased against the striking teachers, and is utterly incapable of rendering a fair and objective judgment on the difficult factual and legal questions of whether the teachers violated the provisions of P.E.R.A.

Since the Board is actually biased against the teachers, it cannot, consistently with the requirements of the Due Process Clause, try the teachers.

▉ It is true that if the Board held P.E.R.A. hearings, those teachers who received adverse decisions could take appeals to the circuit court, which is empowered to review for substantial evidence. M.C.L.A. Sec. 423.206. However, this does not alter the disqualification of the Board, since the teachers are entitled to an impartial tribunal in the first instance, even when a trial de novo is provided. Tumey v. Ohio, 273 U.S. 510, 533, 47 S.Ct. 437, 71 L.Ed. 749 (1927); Ward, supra, 409 U.S. at 61, 93 S.Ct. 80; Gibson, supra, 411 U.S. at 577 n. 16, 93 S.Ct. 1689; cf., Pickering, supra, 391 U.S. at 578–579, n. 2, 88 S.Ct. 1731; Armstrong, supra, 380 U.S. at 551–552, 85 S.Ct. 1187.

Of course, the disqualification of the College Board does not mean that the teachers were legally on strike and that their discharge was wrongful. This must still be determined. Fortunately, Michigan makes broad allowance for declaratory judgment actions to try such questions as the legality of the teachers' work stoppage where resort to the desig-

68. In Local 155 of the International Molders and Allied Workers Union, AFL–CIO v. N.L.R.B., 143 U.S.App.D.C. 20, 442 F.2d 742 (1971), the Court upheld the N.L.R.B.'s finding that the employer's withdrawal of benefits for the purpose, among others, of precipitating a strike at a time favorable to the employer was inherently prejudicial to the Union's statutorily protected rights, and thus a violation of the N.L.R.A. Secs. 8(a)(1) and 8(a)(3), as well as a failure to bargain as required by Sec. 8(a)(5). This was true even though the *sole* purpose of the withdrawal of benefits was not to induce a strike, and even though a strike did not in fact occur. The court reasoned that Section 7 of the N.L.R.A. "protects not only the exercise of the right to strike but also the right to refrain from its exercise." 442 F.2d at 747.

This court observes parenthetically that while the teachers in this case have no right to strike, it may be argued that they have a protected First Amendment associational right not to strike, and that they have such a protected right under P.E.R.A. Certainly it is reasonable to argue that the prohibition on striking necessarily implies a protected right not to strike, and that this protected right qualifies the public employer's freedom not to offer concessions just as the protected right qualifies a private employer's right under the N.L.R.A. to use economic coercion. The qualification of the employer's right not to make concessions seems consistent with the public employer's Due Process obligation to be fundamentally fair to employees.

nated administrative tribunal would be a useless or futile effort for one party. Mich. GCR 1963, 111.1, 521; Welfare Employees Union v. Michigan Civil Service Commission, 28 Mich.App. 343, 184 N.W.2d 247, 250 (1970); Elby v. Livernois Engineering Co., 37 Mich.App. 252, 194 N.W.2d 429, 430 (1972); cf., Gibson, supra, 411 U.S. at 575, 93 S.Ct. 1689.

■ Accordingly, an injunction will issue requiring the defendants to file a declaratory judgment action in the Michigan Circuit Court for the Second Judicial Circuit seeking a declaration that the discharged teachers, plaintiffs in this case, were illegally on strike within the meaning of P.E.R.A. at the time of their discharge. The teachers at that time may raise whatever defenses or equities of fact or law they have, and they may seek a proper construction of the statute. See Smigel v. Southgate Community School District, 388 Mich. 531, 202 N.W.2d 305, 306 (1972).[69]

■ This court will retain jurisdiction of this case pending the outcome of the declaratory judgment action in the state courts. If the state courts decide that the teachers were illegally on strike, then the discharges by the College will have been justified. If the state courts find that the teachers were not illegally on strike, then the full status teachers, at least, will be entitled to reinstatement and damages.[70]

The defendants contend that the Norris-LaGuardia Act, 29 U.S.C. Sec. 101 et seq. deprives this court of jurisdiction to grant injunctive relief (specifically reinstatement) to the plaintiffs in this case.

■ The court finds that Congress did not intend the Norris-LaGuardia Act to limit the power of federal courts to grant injunctive relief when it is called for under the Fourteenth Amendment and its implementing statutes. Reviewing Congress's statement of purposes in Sec. 2 of the Norris-LaGuardia Act, 29 U.S.C. Sec. 102, the Supreme Court observed, "These considerations, on their face, obviously do not apply to the Government as an employer or to relations between the Government and its employees." United States v. United Mine Workers, 330 U.S. 258, 274, 67 S.Ct. 677, 687, 91 L.Ed. 884 (1947). The Court went on to hold that the Act did not apply to situations in which the United States was an employer. Id. at 276, 67 S.Ct. 677. Although United Mine Workers applied specifically to the federal government, many of the same elements of statutory language and legislative history indicate just as clearly that the Act was also not intended to extend to public employment situations on the state and local levels. The plaintiffs' cause of action is based squarely on the Fourteenth Amendment and its implementing statutes, which apply to the defendants here. The court can find no evidence that Congress intended to apply the Fourteenth Amendment to the states in every situation except public employment disputes in which injunctive relief is appropriate.

■ Accordingly, the court holds that the Norris-LaGuardia Act does not apply to limit the authority of this court to grant injunctive relief in this case.

■ In regard to the issue of damages, under 42 U.S.C. Sec. 1983, the

---

69. For example, the plaintiffs might argue that they had probable cause to believe and in fact did believe that the defendants' arbitrary, capricious, unreasonable and provocative conduct amounted to an unfair labor practice, and that they were not in fact on strike for economic purposes within the meaning of P.E.R.A. Certainly, the plaintiffs might argue, it would be unjust to require them to anticipate that the defendants' conduct would be deemed fair by M.E.R.C.

Cf., Pierson, supra, 386 U.S. at 557, 87 S.Ct. 1213. After M.E.R.C. made its determination of course, the teachers were bound to return to work immediately. However, they had made an unconditional offer to return long before M.E.R.C. had decided that the College had acted fairly.

70. The court reserves ruling on the scope of the remedy to which discharged probationary employees may be entitled.

court finds that the defendants have not established their defense of good faith, Pierson, supra, and that the defendants acted in bad faith in provoking the strike and discharging the teachers with the ultimate aim of breaking the Union.

### C.

The plaintiffs have also alleged that the Due Process Clause required the College to hold a full evidentiary hearing before finally discharging the teachers.

■ The Supreme Court recently dealt with the issue of the timing of a discharged public employee's evidentiary hearing. Arnett, supra. Although a majority could not agree upon an opinion, the Court ruled that the Due Process Clause of the Fifth Amendment does not require a full evidentiary hearing before the discharge of a non-probationary government employee, at least where certain safeguards are provided to minimize the risk of error, Id., 416 U.S. at 167–171, 94 S.Ct. 1633 (Powell, J., concurring opinion). While the teachers here were not formally accorded all the protections granted a discharged federal employee, they were not thereby prejudiced. The College was certainly aware of the teachers' position, and the teachers were not precluded from making further written presentations. Although the absence of specific back pay provisions from P.E.R.A. may have the effect of unconstitutionally depriving the plaintiffs of safeguards against error, the court cannot inquire into this question because of its narrow jurisdiction.

The court concludes that under the circumstances the failure of the College to give the teachers a full evidentiary hearing before discharge was not a violation of the Due Process Clause.

### III.

It is ordered that an injunction issue restraining the defendants, or any of them, from holding hearings pursuant to M.C.L.A. Sec. 423.206 to determine the legality of the plaintiffs' work stoppage which commenced on February 15, 1973, or to determine the validity of the defendants' discharge of the plaintiffs as of midnight March 5, 1973.

It is further ordered that the aforesaid injunction will require the defendants to file within thirty days of the issuance of the injunction an action in the Michigan Circuit Court for the Second Judicial Circuit seeking a declaration pursuant to Mich. GCR, 1963, 111.1, 521, that the teachers who were discharged from the employment of Lake Michigan College as of midnight March 5, 1973, and who are plaintiffs in this case, were at the time of discharge illegally on strike within the meaning of the Michigan public employment relations statutes, M.C.L.A. Sec. 423.201 et seq., M.S.A. Sec. 17.455(1) et seq.; and during which declaratory judgment action the plaintiffs in this case may raise whatever defenses or equities of fact or law they have. The injunction will also require the defendants to file with this court a copy of their bill of complaint in the state circuit court and a certified copy of any judgment or final order on the merits rendered by the state courts in the aforesaid declaratory judgment action after the termination of appeals, if any.

It is further ordered that this court shall retain jurisdiction of this cause.

### APPENDIX A.

### OPINION FILED IN SUPPORT OF TEMPORARY RESTRAINING ORDER April 30, 1973.

This action arises out of a labor dispute between the plaintiff teachers and the defendant trustees of the Lake Michigan Community College, a public institution located in Benton Harbor, Michigan. The complaint seeks declaratory and injunctive relief from the college's allegedly wrongful act of discharging the teachers without prior hearing. Specifically, plaintiffs charge that the form and timing of the hearing offered them, pursuant to M.C.L.A. § 423.206, subsequent to discharge, infringed upon their rights to due process of law as se-

cured by the Fourteenth Amendment to the United States Constitution. Jurisdiction of this cause is properly founded upon the provisions of 28 U.S.C. § 1343. Presently before the court are plaintiffs' motion for a preliminary injunction and defendant's motion for the convening of a three-judge court.

The dispute between these parties arises from a long period of contract negotiations. The last contract between the parties expired on August 12, 1972. However, the parties had engaged in negotiations since February 8, 1972. On August 8, 1972 the Board of Trustees of the college requested the services of a mediator. After that the parties had two meetings with the mediator present. However, negotiations were still unsuccessful and five or six major issues remained unsettled.

Then, near the end of August, the teachers requested the services of a fact finder. Mr. J. Warren Eardley of the Grand Rapids Bar was appointed. This court is well acquainted with Mr. Eardley, who is an esteemed and distinguished member of the Federal Bar, and with his recognized fairness, integrity and ability. During the fact finding process two or three of the outstanding issues were settled, leaving only three issues for Mr. Eardley to report on. Mr. Eardley issued his report on these issues on January 11, 1973. His recommended settlements were between the demands of the two parties. The teachers accepted his recommendations, but the trustees rejected them.

After this negotiations were resumed, and then the trustees suddenly announced that they would no longer even consider the "grid" salary schedule which had been consistently used as one of the bases of the past negotiations. This "grid" system provided for automatic wage increases for each year of service with the amount of the increase determined by the academic qualifications of the teacher. This grid system had been incorporated in the previous contract and, in fact, it was the salary system which had been followed by the college ever since its founding. Further, the trustees' proposals which were previously presented to the fact finder had clearly contemplated the continuation of the grid system.

Nevertheless, after the fact finder's report, the trustees remained intransigent and refused to even consider the grid system. As this court stated at the previous hearing, this sort of action, taken after lengthy negotiations, is extremely provocative. In fact, it is so provocative that it must be characterized as being violent, if not barbaric.[1] This is the sort of action which may be employed to break a union.

This case does not involve an impoverished school district pleading financial inability to make a wage adjustment in light of the extraordinary inflationary condition of the times, but rather a financially able school district. It is not only a circumstance in which there was a refusal to make this upward adjustment in the compensation system, but a deliberate and considered withdrawal of promotional and ability improvement of compensation standard, and thereby substantially reduced the financial condition of the school teachers.

Following this, the union membership voted to strike and the strike was begun on February 15, 1973. Also, unfair labor practice charges were filed by the union; these charges are still undecided. The trustees then voted to discharge all of the teachers on strike and these discharges became effective on March 5, 1973. Only a few of the approximately sixty discharged teachers have been able to find other employment (as bartenders, etc.) since this mass firing.

---

1. "Barbarism is not, I repeat, the forest primeval with all its relatively simple savageries. Barbarism has long had its definition, resumed by St. Thomas after Aristotle. It is the lack of reasonable conversation according to reasonable laws. Here the word 'conversation' has its twofold Latin sense. It means living together and talking together." Murray, S. J., "We Hold These Truths," Sheed and Ward, 1960, at p. 18.

As stated earlier, the defendant's motion for a three-judge court is presently before this court. That motion will not be decided today as the court just recently received the briefs and wishes to consider the matter further. However, a temporary restraining order requiring the teachers to return to their work and that the teachers be reinstated will be issued today, as this court has determined that this is the sort of emergency matter which should be decided by a single judge even if a three-judge court is warranted pursuant to 28 U.S. C.A. § 2284(3):

> "In any such case [three-judge court case] in which an application for an interlocutory injunction is made, the district judge to whom the application is made may, at any time, grant a temporary restraining order to prevent irreparable damage. The order, unless previously revoked by the district judge, shall remain in force only until the hearing and determination by the full court. It shall contain a specific finding, based upon evidence submitted to such judge and identified by reference thereto, that specified irreparable damage will result if the order is not granted."

This court finds that irreparable damage will result if temporary injunctive relief is not granted, especially since this time of extraordinary inflation has a devastating and lasting effect on the welfare of the teachers' families.

That specific irreparable damage is the damage that will be done to these plaintiffs if they are forced to remain out of work and without wages during the pendency of this suit. There was testimony, for example, that one of the teachers has a retarded child who needs medical care and another teacher needs medical care himself. Therefore, even if it is decided that this is a proper case for a three-judge court, temporary relief is authorized by 28 U.S.C.A. § 2284. The loss of the breadwinner's wages, even for a short period of time, constitutes specific irreparable damage. That is especially true in this case where there is testimony that several of the plaintiffs are the sole support of families with several younger children.

Also, in issuing this order the court notes two other key factors. First, the equities on the side of the plaintiffs who have offered to return to work and who originally struck only after provocation.[2] Second, the fact that the plaintiffs' constitutional claim is clearly substantial. The right of a teacher to a hearing prior to discharge was discussed by the Supreme Court in Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L. Ed.2d 548 (1972). In that case, the Supreme Court stated that:

> Similarly, in the area of public employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Board of Education, 350 U.S. 551 [76 S.Ct. 637, 100 L.Ed. 692], and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 [73 S.Ct. 215, 97 L.Ed. 216], have interests in continued employment that are safeguarded by due process. Only last year, the Court held that this principle "proscribing summary dismissal from public employment without hearing or inquiry required by due process" also applied to a teacher recently hired without tenure or a formal contract, but nonetheless with a clearly implied promise of continued employment. Connell v. Higgenbotham, 403 U.S. 207, 208 [91 S.Ct. 1772, 1773, 29 L.Ed.2d 418, 420, 421].

> 408 U.S. at 576–577, 92 S.Ct. at 2709, 33 L.Ed.2d at 560–1.

Further, the Court also stated in a footnote that:

> Before a person is deprived of a protected interest, he must be afforded opportunity for some kind of a

---

2. Americans have traditionally resisted arbitrary action, which may be akin to that which in earlier history motivated a unique tea party in Boston Harbor.

hearing, "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." Boddie v. Connecticut, 401 U.S. 371, 379 [91 S.Ct. 780, 28 L.Ed. 2d 113, 119]. "While '[m]any controversies have raged about . . . the Due Process Clause,' . . . it is fundamental that except in emergency situations [and this is not one] due process requires that when a State seeks to terminate [a protected] interest . . ., it must afford 'notice and opportunity for hearing appropriate to the nature of the case' *before* the termination becomes effective." Bell v. Burson, 402 U.S. 535, 542 [91 S.Ct. 1586, 29 L.Ed.2d 90, 96]. For the rare and extraordinary situations in which we have held that deprivation of a protected interest need not be preceded by opportunity for some kind of hearing, see, e. g., Central Union Trust Co. v. Garvan, 254 U.S. 554, 566 [41 S.Ct. 214, 65 L. Ed. 403, 408]; Phillips v. Commissioner, 283 U.S. 589, 597 [51 S.Ct. 608, 75 L.Ed. 1289, 1297]; Ewing v. Mytinger & Casselberry, Inc., 339 U. S. 594 [70 S.Ct. 870, 94 L.Ed. 1088]. 408 U.S. at 570, 92 S.Ct. at 2705, 33 L.Ed.2d at 556, fn. 7.

On the merits the state will undoubtedly argue that this is a case where the state has an extraordinary interest in proceeding without a hearing and it might be argued that that governmental interest is the state's interest in preventing public employee strikes. However, this court notes that that would not really be the issue, rather, the issue would be whether the state has such a strong interest in being able to not only summarily discharge a public employee but to also be able to effectuate that discharge without a prior hearing. If this latter procedure was deemed to be necessary by the state, it seems unlikely that the state would have repealed M.C.L.A. § 423.204 (automatic termination of employment for striking) in 1965.

Therefore, this court concludes that there is a substantial probability that these plaintiffs have been denied due process rights.

The following court order is intended, therefore, to return the parties to the status quo of the date on which the fact finder issued his report. This court notes that bargaining, after a fact finder's report, generally includes bargaining aimed at a resolution around, at or near the fact finder's recommendations. This court strongly urges these parties to engage immediately in such bargaining and to seriously consider the fact finder's recommendations.

After all, under the Michigan Public Employment Relations Act, a fact finder is as close as the parties can come to binding arbitration and, since the trilogy, it is established that arbitration is a very favored process. See United Steelworkers of America v. American Manufacturing Co.; 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S. Ct. 1347, 4 L.Ed.2d 1409 (1960), and United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

This court recognizes that the teachers may have violated a no-strike law (see M.C.L.A. § 423.202) and that the teachers' remedy even if the trustees committed an unfair labor practice should have been an unfair labor practice proceeding (see M.C.L.A. § 423.-216). However, this court also notes, that the Public Employment Relations Act clearly places a duty of good faith bargaining on all of the parties. (See M.C.L.A. §§ 423.210 and 423.215.)

The subject of good faith bargaining has been the focus of much discussion and refinement in the field of labor relations and labor law. The most noteworthy and one of the most recent decisions in the area was that in General Electric Company, 150 N.L.R.B. 192 (1964).

The following comments are excerpted from that opinion:

"... a party who enters into bargaining negotiations with a 'take-it-or-leave-it' attitude violates its duty to bargain ... For good-faith bargaining means more than going through the motions of negotiating.

"In practical effect, Respondent's 'bargaining' position is akin to that of a party who enters into negotiations with a predetermined resolve not to budge from an initial position, an attitude inconsistent with good-faith bargaining. In fact, Respondent here went even further. It consciously placed itself in a position where it *could not give unfettered consideration* to the merits of any proposals the Union might offer." (Emphasis supplied.)

These comments came in response to an employer's approach to contract negotiations wherein it decided upon figures and terms it felt to be most fair and just and then presented the unilaterally derived package to the individual employees on a firm "take-it-or-leave-it" basis. By this technique the employer not only circumvented the union but also boxed itself into a corner so as to essentially deprive itself of the freedom to adjust its offer. The employer's firm public commitment to the predetermined contract offer served to divest its negotiators of authority to respond favorably to subsequent union proposals. This approach was held to violate the requirements of good faith bargaining. (It is commonly known as "Boulwareism," after Lemuel R. Boulware, a former General Electric Vice President who first devised it in the late 1940's.)

Also, the parties are under a duty to engage in *good faith mediation.* See Op.Atty.Gen.1957-48, No. 662, p. 536. These good faith duties constitute the spirit of the Public Employment Relations Act and the Board of Trustees should strive to meet that spirit in its bargaining with the teachers. The teachers are not the Board's enemies, in fact, the teachers are citizens of the community and may even be neighbors of the Board members.

## "ARTICLE 8—EDUCATION

§ 1. Encouragement of education

Sec. 1. Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.

### Convention Comment

No change from Sec. 1, Article XI, of the present [1908] constitution."

This Article is a declaration of the principles and the supreme law of the State in the field of education. Michigan Constitution of 1963.

Section 1, Article 8's language is verbatim from the Northwest Ordinance of 1787, Article III. MCLA, Vol. 1, page 238. The Northwest Ordinance was adopted as the Act of the Continental Congress of July 13, 1787 to govern the Northwest Territory, a vast land mass of more than 250,000 square miles. Michigan was one of the states established from the Territory.

The authors of this statement are comparable to the authors of the Declaration of Independence and no one could ever take religion more seriously and earnestly than the Puritans and their compatriots who founded this nation.

In Fountain of Justice, by John C. H. Wu, Sheed and Ward, 1955, page 127, is observed:

"To them 'the laws of nature and nature's God' were no products of fancy, nor even mere ideals; they were absolutely *real,* infinitely more real than any human laws. Nor were Americans indulging in rhetoric when they declared, 'We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness.' They meant exactly what they said.

They were a generous, sincere, freedom-loving and God-fearing people. They saw these truths so clearly and felt so deeply about them that they were willing to stake their lives upon them."

Since these men who authored the Article, the declaration of principles embodied in the educational system of the State of Michigan, meant precisely what they said, we likewise should in the field of education, by our example and actions, promote the same concepts and principles of morality. The source of their religious tenets was in the Judeo-Christian tradition and one of Christ's teachings is apropos in the present situation.

" . . ., a certain lawyer got up to test him, saying, 'Master, what must I do to gain eternal life?' But he said to him, 'What is written in the Law? How dost thou read?' He answered and said,

'Thou shalt love the Lord thy God
   with thy whole heart,
   and with thy whole soul,
   and with thy whole strength,
   and with thy whole mind;
And thy neighbor as thyself.'

"And he said to him, 'Thou has answered rightly; do this and thou shalt live.' But he, wishing to justify himself, said to Jesus, 'And who is my neighbor?'" Luke, Chapt. 10, Verses 25–30.

You are each other's neighbor. If you truly love your neighbor, would you treat your neighbor in the same way as you are now treating him?

If you can acquire the mentality of loving your neighbor and applying it to your negotiations, I am certain there will be no need of further extraordinary expenditures of money in litigation. You will become the most reasonable of men. You will readily resolve your dispute. If we can muster the courage to dare to speak and act on the notion, the virtue of love of our neighbor, we would, over night, change this divided and fearful nation of ours to truly—"One nation, under God, with liberty and justice for all."

## APPENDIX B.

McCREE and ENGEL, Circuit Judges.

### ORDER DISSOLVING THREE-JUDGE COURT

Plaintiffs, former teachers employed by the Lake Michigan Community College and their certified bargaining agent, Lake Michigan College Federation of Teachers, have brought this action against the college alleging that the discharge of the individual plaintiffs caused by their refusal to render services on or about February 15, 1973, was unlawful and in violation both of Michigan statutes and of the United States Constitution and seeking reinstatement. Upon notification of their discharge the individual plaintiffs, in accordance with Michigan law, timely filed a request for review of the propriety of defendant's action, and defendant notified them of the date set for hearing the matter. Prior to the date set for hearing, plaintiffs filed this action in which their request that the hearing be stayed pending disposition of their claim that the discharge was unlawful was granted. Defendants' motion to convene a three-judge court on the grounds that plaintiffs were seeking to enjoin the operation of a state statute on the grounds that it was repugnant to the United States Constitution was granted.

Upon considering the memoranda and oral argument which has been transcribed on the question of the propriety of convening a three-judge court, and it appearing from the pleadings that this is not a case in which an injunction is sought to restrain the operation of a state statute on the ground that it is repugnant to the United States Constitution but is instead an action for remedial relief for an allegedly unlawful discharge from employment, *cf.* Gully v. Interstate Natural Gas Co., 292 U.S. 16, 54

S.Ct. 565, 78 L.Ed. 1088 (1938); Bistrick v. University of South Carolina, 319 F.Supp. 193 (D.S.C.1970), it is ordered that the three-judge court be, and it is hereby dissolved and the case is remanded to the calendar of Chief Judge Noel P. Fox.

FOX, Chief District Judge, dissenting.

It appears that this case may be appropriate for a three-judge district court under 28 U.S.C. Secs. 2281 and 2284. At the time when the events giving rise to this suit occurred, the plaintiffs and defendants were involved in a serious employment dispute. All parties concede that they were subject to the Michigan Public Employees Relations Act, M.C.L.A. Sec. 423.201 et seq. and more particularly, Section 6 of that Act, M.C.L.A. Sec. 423.206, although it is not clear precisely how the Act applies to this case. This Act plainly embodies a state policy as to the handling of strikes by public employees. The plaintiffs have sought injunctive and other relief on the grounds that the actions of the defendants were unconstitutional. If the court concludes that the actions of the defendants were unconstitutional, and grants injunctive relief, the court may be acting within the scope of 28 U.S.C. Sec. 2281. See School District for the City of Holland v. Holland Education Association, 380 Mich. 314, 157 N.W.2d 206, 210 (1968); Calloway v. Briggs, 443 F. 2d 296 (6th Cir. 1971).

However, the matter is not in the least free from doubt. In such circumstances, considerations of judicial economy and fairness to the parties suggest that three judges hear the case and arrive at a conclusion after hearing all the evidence and arguments. In order to avoid the possibility of a rehearing in the event of error, the district judge before whom the case would be tried if a three-judge court were not required usually adopts the opinion and order of the three-judge court as his own. In unusual circumstances, the possibility of rehearing might be avoided by declaring the suit to be a non-statutory three-judge case.

With these considerations in mind, the original three-judge panel decided, after hearing argument on the motion for a three-judge court, that the case should proceed as a three-judge court. Final decision on the three-judge court issue was to be deferred until after a hearing on the merits. Because of the real possibility that a three-judge panel is required in this case, I would adhere to the original decision.